IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 106,111

STATE OF KANSAS,
*Appellee*,

v.

KEAIRA BROWN A/K/A KEAIRE BROWN,
*Appellant.*

SYLLABUS BY THE COURT

1.

On appeal, the factual findings supporting a district court's order authorizing adult prosecution of a juvenile are reviewed for substantial competent evidence. The district court's evaluation and weighing of the statutorily-enumerated factors are reviewed for abuse of discretion.

2.

When a party fails to object to or request a jury instruction at trial, an appellate court reviews any issue regarding the instruction under the clearly erroneous standard of K.S.A. 22-3414(3). In applying this standard, the reviewing court first determines whether there was error. This inquiry turns upon whether the instruction was legally and factually appropriate.

3.

In a felony murder case under K.S.A. 21-3401(b), it is legally appropriate to instruct a jury that it can find a defendant guilty upon proof the defendant committed a killing while in flight from an attempt to commit an inherently dangerous felony.

1

4.

The legislature did not intend to create alternative means of committing felony murder under K.S.A. 21-3401(b) by providing that felony murder occurs when there is a death "in the commission of, attempt to commit, or flight from an inherently dangerous felony." Instead, the phrase "in the commission of, attempt to commit, or flight from" describes factual circumstances sufficient to establish a material element of felony murder.

5.

When sufficiency of the evidence is challenged in a criminal case, an appellate court's standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the reviewing court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility.

6.

An appellate court reviews a prosecutorial misconduct claim alleging improper comments using a two-step analysis. First, the appellate court decides whether the comments were outside the wide latitude a prosecutor is allowed, *e.g.*, in discussing evidence. If so, there was misconduct. Second, if misconduct is found, the appellate court determines whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial.

7.

It is improper for a prosecutor to offer his or her personal opinion as to witness credibility, including the defendant.

8.

The statutory sentencing scheme requiring that mandatory hard 20 life sentences be imposed on defendants convicted of felony murder does not violate the Eighth Amendment to the United States Constitution as applied to defendants who were under 18 years of age at the time of their crimes.

Appeal from Wyandotte District Court; ERNEST L. JOHNSON, judge. Opinion filed August 15, 2014. Affirmed.

*Lydia Krebs*, of Capital Appellate Defender Office, argued the cause, and was on the brief for appellant.

*Sheryl L. Lidtke*, chief deputy district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Keaira Brown appeals her convictions for felony murder and attempted aggravated robbery. She was 13 years old at the time the crimes occurred, and she was tried as an adult. She received a controlling hard 20 life sentence. She challenges the district court's waiver of juvenile jurisdiction, her convictions, and her life sentence.

As to the juvenile jurisdiction waiver, Brown argues the district court erred in analyzing the statutorily-enumerated factors that guided its decision. Regarding her convictions, she claims: (1) error instructing the jury that a killing in the flight from an attempt to commit an inherently dangerous felony constitutes felony murder; (2) insufficient evidence to support a conviction for each alternative means she claims the statute specifies for felony murder; (3) insufficient evidence to support her aggravated attempted robbery conviction; and (4) prosecutorial misconduct. Finally, Brown argues her hard 20 life sentence must be vacated because mandatory life sentences are

3

unconstitutional as applied to offenders who were younger than 18 at the time of their crimes. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On July 23, 2008, 16-year-old Scott Sappington, Jr., sustained a fatal gunshot wound to the upper right side of his face. The wound was inflicted from point-blank range. Sappington's body was found with the head and torso lying across the driver's seat of his car with his legs and feet hanging out the driver's side window. The head wound was inflicted in the short period of time between Sappington approaching his car, which was parked in front of his grandmother's house, and the car coming to rest on a neighbor's curb after crashing into a fire hydrant and light pole as it rolled down the street.

Eyewitnesses saw a person walking toward Sappington's vehicle just before hearing two people argue, saw the vehicle roll down the street, heard a crashing noise, and saw a person leave the scene on foot after the car had stopped. Near the crime scene, other witnesses saw a person headed south on foot. And several blocks further south, a person approached two children who were playing outside, gave them some bloody clothing, and used a garden hose to wash off.

During the police investigation, Brown was identified as a suspect. Her DNA and fingerprint were discovered on the exterior of the front passenger side door of Sappington's car. The witness descriptions of the person seen approaching and leaving Sappington's vehicle matched Brown. Additional evidence and witness identifications further established Brown was the person seen heading south from the crime scene and who abandoned the bloody clothing. Neither the murder weapon nor any shell casings were found.

4

The State instituted juvenile proceedings alleging Brown committed felony murder with the underlying felony of aggravated robbery or attempted aggravated robbery. The State moved for authorization to prosecute Brown as an adult, which the district court granted after an evidentiary hearing.

At trial, Brown testified. She admitted being at the crime scene. She said she came upon a black car and noticed it was beat up or wrecked and that a pole had been knocked down. She saw a pair of feet sticking out of the car's driver's-side window and said, "hey," but no one answered. She said she entered the vehicle's passenger side and tried to shake Sappington to get a response, causing blood to get on her "hands and stuff." She said Sappington just looked hurt, not dead. She said she left the scene because she heard sirens and was not supposed to be in the area without permission. She denied witnessing any altercation or a shooting.

Brown said she "just ran" and did not know where she went. She admitted abandoning her clothes and using a water hose to wash off. She said she went with her cousin to meet her sister at a friend's house, stayed out until about 11 p.m., and then went home to sleep. She did not tell her mother, cousin, or sister what she had seen.

The jury found Brown guilty of first-degree felony murder and attempted aggravated robbery. The district court sentenced Brown to a hard 20 life sentence for first-degree murder and a concurrent 32-month sentence for attempted aggravated robbery. She timely appealed. Jurisdiction is proper. See K.S.A. 22-3601(b)(1). Additional facts will be discussed as applicable to the issue addressed.

THE JUVENILE JURISDICTION WAIVER

Brown argues the district court erred when it waived juvenile jurisdiction and authorized the State to prosecute her as an adult. She asserts the district court abused its

5

discretion in analyzing the statutorily-enumerated factors governing such decisions and that certain factual findings by the district court lacked substantial competent evidence.

*Standard of Review*

K.S.A. 2013 Supp. 38-2347(e) directs the district court to consider eight statutory factors when deciding whether to certify a juvenile for adult prosecution. On appeal, that decision is subject to a dual standard of review. The district court's factual findings are reviewed for substantial competent evidence. *State v. Bailey*, 292 Kan. 449, 453, 255 P.3d 19 (2011); *In re D.D.M.*, 291 Kan. 883, 893, 249 P.3d 5 (2011). But the district court's assessment of the eight statutory factors, which is based upon proved facts, should be reviewed for an abuse of discretion. 291 Kan. at 893. The district court is not constrained by the insufficiency of evidence to support one or more of the factors. The statute connotes trial court discretion in "evaluating and weighing the factors to determine whether the juvenile 'should' be prosecuted as an adult." 291 Kan. at 893.

Substantial competent evidence "'is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved.'" 291 Kan. at 893. The appellate court accepts as true all evidence and the inferences to be drawn from that evidence supporting or tending to support the district court's findings. The appellate court does not reweigh the evidence, substitute its evaluation of the evidence for the trial court's, or pass upon witness credibility. 291 Kan. at 893.

A district court abuses its discretion when: (1) no reasonable person would take the view adopted by the trial judge; (2) a ruling is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based. *State v. Huddleston*, 298 Kan. 941, 960, 318 P.3d 140 (2014).

*Additional Facts*

At the waiver hearing, the State put on evidence about the crime. It also presented evidence of prior, uncharged incidents involving Brown: (1) a journalist said Brown threw rocks at his news vehicle while he was driving it in Kansas City, Missouri, in April 2008; (2) evidence that Brown, during an argument with her aunt, hit her in the face with an iron; and (3) a witness said she was in a fight with Brown's sister at a club and that about a week before Sappington was killed, Brown fired three or four gunshots at the witness' car while the witness was driving it.

The administrator of the juvenile detention center where Brown was being held also testified for the State. She said Brown participated in school lessons at the facility, had regular meetings with a therapist at least twice a month, and had attended cognitive behavioral classes for 2 hours once a week since January 2009. She also said Brown had approximately 57 disciplinary infractions since being admitted to the facility, 37 of them considered major. Those major infractions included fights, threats to other residents, and security violations. In one instance, Brown accessed a security panel and pressed buttons to release locked doors.

Brown put on testimony from a pastor who had visited her several times since she was detained. He said she acted like a child in her dealings with him and did not hold herself out as an adult. He said he was aware of programs in the juvenile justice system that could help Brown, such as a diversion program, a probation program, and prevention programs. But he agreed that, outside the probation program, all those he identified focused on intervening before a juvenile commits a crime; that his opinion was based on knowledge of services available to people unlike Brown; and that he had no first-hand knowledge, experience, or training to base his opinion that juvenile justice system programs could help Brown.

7

An intensive supervision officer for the juvenile division of Wyandotte County Community Corrections testified she works with children in the juvenile system and was familiar with programs offered to juvenile offenders at the Beloit Juvenile Correctional Facility. She said she found these programs helped offenders, even ones accused of "pretty bad things." On cross-examination, she admitted she was not aware of any program designed for youth accused of off-grid crimes, such as the felony murder charge against Brown, and that just as many juveniles do poorly after release as those who do well. She had no statistics on recidivism. She also testified juvenile offenders can remain in the system until they are 22 1/2 years old; but she admitted she had never seen that happen, though she said she had seen some offenders remain into their 20s.

Brown's mother, who Brown lived with except from 2003 to 2006 when the mother was incarcerated for conspiracy to import cocaine, testified she had not known Brown to have weapons. She acknowledged hearing about a few delinquent acts at school. A sister and a family friend testified Brown acts like a kid.

Brown's father testified he had never seen Brown use a gun or be violent. He said Brown developed an emotional disorder and tried to hurt herself when her mother was incarcerated. He said he was against medication because he believed Brown's behavior was caused from missing her mother. On cross-examination, the State asked him about Brown's school records, which reflected disciplinary problems in middle school including drug possession, weapon possession, fighting, an out-of-school suspension for assault, defiance of authority, dangerous behavior, and sexual harassment. The State also asked about records of an out-of-school suspension in second grade for assaulting another student. He denied Brown was disciplined or suspended for violence at school.

Bruce Cappo, a psychologist, evaluated Brown and diagnosed her with conduct disorder, noting a prior diagnosis of major depression with past suicide attempts, and numerous self-harm concerns while incarcerated. Cappo said Brown sometimes looked to

her mother for responses during his evaluation, which he believed is something a girl her age would do and inconsistent with someone trying to present themselves as equal to adults. Cappo said rehabilitative programs geared toward violent offenders existed, giving Beloit as an example. Cappo said it was possible to change Brown's behavior because she was still in her formative years and the juvenile system still had almost 7 years to work with her. On cross-examination, Cappo agreed the future risk of delinquency and harm to others was greater the earlier aggressive behavior begins, so a person who becomes aggressive at 13 is at a statistically greater risk of reoffending than one who becomes aggressive at 17.

Ruling from the bench, the district court waived juvenile jurisdiction. It cited the seriousness of the offense; that the offense was committed in an aggressive, violent, and willful manner; that it was a person offense; that the evidence fell short of establishing a likelihood Brown could be rehabilitated before juvenile jurisdiction expired; and that the interest of the community, *i.e.*, community protection, would be better served waiving juvenile jurisdiction. The court did not believe the evidence of the prior uncharged offenses was substantial enough to weigh toward waiver and that Brown's prior history weighed only slightly in favor of waiving jurisdiction. Similarly, the court did not find the evidence of Brown's maturity level was enough to consider that factor in the analysis. The district court also ruled there was probable cause to bind Brown over for trial on all charges.

In its written decision that followed, the district court reached the same conclusion but changed its rationale somewhat. It wrote: "In any conflict between the findings and holding announced from the bench and the contents of this memorandum, those made orally from the bench should control." Relevant here, the district court stated that Brown's sophistication and maturity level weighed in favor of waiver (when it had been a "wash" in the oral ruling) because her consistent infractions at the juvenile detention center indicated a disdain for authority and lack of fear of consequences, which was not found in

9

child-like people. The court further noted Brown had decided to stop attending school regularly and had a record of disciplinary trouble and violence early on. In analyzing this factor, the district court reasoned that the way Brown allegedly approached Sappington, killed him, then calmly left the scene and disposed of evidence was relevant to her emotional attitude but specifically noted that did not make her responsible as an adult. It then stated Brown's "choice at her young age to adopt the grooming habits and clothing of a boy are also indications of a [more] mature attitude."

*Discussion*

The Revised Kansas Juvenile Justice Code (Revised Code), K.S.A. 2013 Supp. 38-2301, *et seq.*, generally governs proceedings concerning juveniles. K.S.A. 2013 Supp. 38-2304. For the Revised Code's purposes, a "juvenile" is a person under 18 years old, but at least 10 years old, who is alleged to be a juvenile offender. K.S.A. 2013 Supp. 38-2302(i). The term "juvenile offender" includes "a person who commits an offense while 10 or more years of age but less than 18 years of age which if committed by an adult would constitute a felony or misdemeanor as defined by K.S.A. 2013 Supp. 21-5102 . . . ." K.S.A. 2013 Supp. 38-2302(n).

After commencing proceedings under the Revised Code, the county or district attorney may move for authorization to prosecute the juvenile as an adult. K.S.A. 2013 Supp. 38-2347(a)(1). "The juvenile shall be presumed to be a juvenile unless good cause is shown to prosecute the juvenile as an adult." K.S.A. 2013 Supp. 38-2347(a)(1). But if the juvenile was 14 or older at the time of the alleged offense and the offense would, for example, be an off-grid crime if committed by an adult, the juvenile is presumed to be an adult and "the burden is on the juvenile to rebut the presumption by a preponderance of the evidence." K.S.A. 2013 Supp. 28-2347(a)(2).

The district court may authorize adult prosecution "if the court finds from a preponderance of the evidence that the alleged juvenile offender should be prosecuted as an adult for the offense charged." K.S.A. 2013 Supp. 38-2347(f)(1). The statute sets out the decision making process as follows:

"In determining whether or not prosecution as an adult should be authorized or designating the proceeding as an extended jurisdiction juvenile prosecution, the court shall consider each of the following factors:

"(1) The seriousness of the alleged offense and whether the protection of the community requires prosecution as an adult or designating the proceeding as an extended jurisdiction juvenile prosecution;

"(2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;

"(3) whether the offense was against a person or against property. Greater weight shall be given to offenses against persons, especially if personal injury resulted;

"(4) the number of alleged offenses unadjudicated and pending against the juvenile;

"(5) the previous history of the juvenile, including whether the juvenile had been adjudicated a juvenile offender under this code or the Kansas juvenile justice code and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence;

"(6) the sophistication or maturity of the juvenile as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living or desire to be treated as an adult;

11

"(7) whether there are facilities or programs available to the court which are likely to rehabilitate the juvenile prior to the expiration of the court's jurisdiction under this code; and

"(8) whether the interests of the juvenile or of the community would be better served by criminal prosecution or extended jurisdiction juvenile prosecution.

"The insufficiency of evidence pertaining to any one or more of the factors listed in this subsection, in and of itself, shall not be determinative of the issue. Subject to the provisions of K.S.A. 2013 Supp. 38-2354, and amendments thereto, written reports and other materials relating to the juvenile's mental, physical, educational and social history may be considered by the court." K.S.A. 2013 Supp. 38-2347(e).

Brown first argues that the district court abused its discretion by improperly shifting the burden of proof to her when it concluded the absence of evidence on the seventh factor concerning available rehabilitation programs weighed in favor of adult prosecution. But this argument mischaracterizes the district court's analysis. "[T]he district court is certainly permitted to consider evidence which is elicited through the cross-examination of . . . witnesses." *In re D.D.M.*, 291 Kan. at 893.

Brown's psychologist (Cappo) testified about the opportunity for Brown's rehabilitation within the juvenile justice system. And in considering that this factor weighed in favor of adult prosecution, the district court relied on Cappo's cross-examination concessions that Brown would be a "challenging case," that prior interventions failed to end Brown's antisocial behavior, and that programs "could help rehabilitate Brown." It also noted Cappo stopped short of concluding the programs were "likely" to rehabilitate Brown. In short, the State put on evidence supporting the district court's determination that available facilities or programs were not likely to rehabilitate Brown before juvenile jurisdiction expired.

12

Brown next argues the district court erred by separately considering the first three factors concerning the seriousness of the offense; whether it was committed in an aggressive, violent, premeditated, or willful manner; and whether the offense was against a person or property. She claims those factors are duplicitous when the alleged offense is an off-grid crime. Her contention is that an off-grid crime necessarily satisfies all three factors, so the second and third factors are surplus. She asserts the legislature did not intend the second and third factors should enter the waiver analysis with off-grid offenses, so the district court abused its discretion by determining all three factors weighed in favor of adult prosecution. This argument is meritless.

Each of these first three factors concern different subject matter. See K.S.A. 2013 Supp. 38-2347(e)(1)-(3); *cf. State v. Vargas*, 260 Kan. 791, 800, 926 P.2d 223 (1996) (under prior code utilizing same factors, substantial competent evidence supported adult prosecution for murder when district court "considered not only the gravity of the offense, but also . . . the aggressive manner in which the crime was committed [and] the fact that the crime was against a person rather than property . . . ."). They are not redundant or surplus just because they might necessarily weigh in favor of adult prosecution when particular crimes are alleged.

Moreover, the argument that legislative intent is subverted by considering all three factors when the juvenile is accused of an off-grid crime finds no support in the statute. Brown's interpretation contravenes the statute's express language, which commands that the district court "shall consider each of the . . . factors." K.S.A. 2013 Supp. 38-2347(e). And the legislature enumerated all three factors while simultaneously recognizing the possibility the juvenile could be charged with an off-grid offense. See K.S.A. 2013 Supp. 38-2347(a)(2) (juveniles 14-17 presumed adult when offense alleged would be off-grid if committed by adult).

13

Brown next argues the district court erred when assessing Brown's "sophistication or maturity . . . as determined by consideration of [Brown's] home, environment, emotional attitude, pattern of living or desire to be treated as an adult." This factor "is designed to ascertain whether a juvenile has sophistication and maturity *beyond* that of a juvenile." *State v. Stephens*, 266 Kan. 886, 892, 975 P.2d 801 (1999). Brown contends the district court erred, first by relying on the facts of the crime in its assessment, and second, by relying on evidence of Brown's grooming habits.

In its oral ruling, the district court said:

"I find—frankly that that factor is a wash. I think there are reasons to believe that there are—are aspects of Miss Brown that are 13 years of age, and there are aspects of her that are of an adult age. So I don't believe that is particularly helpful in this case."

In its memorandum opinion, the court added:

"The Court is careful not to rely too heavily on the adult-like nature of the crime charged. While the Court does believe that it is relevant to the factor, it is clear in a large majority of waiver cases the crime will fit, by level of violence or planning or some other measure, into adult-type behavior. In this case, it certainly did. For a person to arm themselves, calmly approach a scene, slay a young man and then calmly leave the scene and dispose of incriminating evidence all are very adult activities. *While this is relevant to her emotional attitude etc., as an isolated incident, it does not simply make the person responsible (if that is established) an adult. The question requires more study.*" (Emphasis added.)

While these passages make clear the district court did consider the circumstances of the crime when assessing Brown's maturity level, they equally demonstrate those considerations were not conclusive to the district court's ultimate assessment of this factor. Brown's argument as to this aspect of the district court's analysis is without merit.

14

Finally, Brown challenges the district court's statement in its memorandum opinion that Brown's "choice at her young age to adopt the grooming habits and clothing of a boy are also indications of a [more] mature attitude." We also question the relevancy that Brown's grooming habits might have and what inferences are properly drawn from them, but this was not part of the oral ruling that the district court expressly designated as controlling nor was this the only evidence referenced in the memorandum opinion underlying the analysis of this factor. Therefore, we conclude that even if the district court erred by determining Brown's maturity level weighed in favor of waiver based on her grooming habits, this error alone would not require reversal. See *In re D.D.M.*, 291 Kan. at 894 (upholding district court's decision not to waive juvenile jurisdiction, but observing portion of district court's analysis that juvenile's lack of maturity favored this result was not entitled to deference because it lacked evidentiary support and noting insufficient evidence as to one or more factors is not determinative).

Based on our review of the district court's collective analysis of the factors, we hold there was no abuse of discretion in waiving juvenile jurisdiction.

FELONY-MURDER INSTRUCTION

Brown argues next that the district court erred by instructing the jury it could find her guilty of felony murder if it found she killed Sappington while in "flight from attempting to commit aggravated robbery." The thrust of her claim is that felony murder cannot be based upon a killing done while in flight from attempted aggravated robbery. Some additional facts are helpful.

Without objection by Brown, the district court instructed the jury:

15

"In Count One of the Information, [Brown] is charged with the crime of murder in the first degree—felony murder while in the commission of aggravated robbery. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That [Brown] killed Scott Sappington, Jr.;

"2. That such killing was done while in the commission of, attempt to commit, *or flight from attempting to commit aggravated robbery*; and

"3. That this act occurred on or about the 23rd day of July, 2008, in Wyandotte County, Kansas.

"The elements of the completed crime of aggravated robbery are as follows:

"1. That the defendant intentionally took property from the presence of Scott Sappington, Jr.;

"2. That the taking was by force;

"3. That the defendant inflicted bodily harm on Scott Sappington, Jr.; and

"4. That this act occurred on or about the 23rd day of July, 2008." (Emphasis added.)

*Standard of Review*

When a party fails to object to or request a jury instruction at trial, review on appeal is limited to determining whether the instruction was clearly erroneous. K.S.A. 22-3414(3); see *State v. Herbel*, 296 Kan. 1101, 299 P.3d 292 (2013). The application of this standard consists of two parts. "First, 'the reviewing court must . . . determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an

16

unlimited review of the entire record.'" 296 Kan. at 1121 (quoting *State v. Williams*, 295 Kan. 506, Syl. 4, 286 P.3d 195 [2012]).

"If error is found, then the second part is considered, *i.e.,* the clearly erroneous analysis moves to a reversibility inquiry and

'the court assesses whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal.'" 296 Kan. at 1121 (quoting *Williams,* 295 Kan. 506, Syl. ¶ 5).

*Discussion*

At the time of Brown's crimes, first-degree murder was defined as the killing of a human being committed, "(b) in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto." K.S.A. 21-3401. Aggravated robbery is an "inherently dangerous felony." K.S.A. 21-3436(4).

As the State points out, the version of PIK Crim. 3d in effect at the time conformed to the instruction actually given. See PIK Crim. 3d 56.02 (Supp. 2009). The use of that form and the identical "flight from attempting to commit" language was accepted in *State v. Griffin*, 279 Kan. 634, 112 P.3d 862 (2005) (approving language in PIK Crim. 3d 56.02A given when premeditated first-degree murder and felony-murder were both charged). Like Brown, the defendant in *Griffin* argued that language misstated the law because that combination of acts was not included in the felony-murder statute. The court held:

17

"As can be seen in this excerpt from the pattern instruction, flight from attempting to commit an inherently dangerous felony is included. 'The Pattern Instructions for Kansas were developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions, and while they are not required, they are strongly recommended for use by Kansas trial courts.' [Citation omitted.] Although it might have been better practice for the trial judge to have selected [from the pattern instruction] only the parenthetical phrases that fit the facts of this case, in which event the challenged phrase would not have been included in the jury instruction, the phrase is not a misstatement of the law." *Griffin*, 279 Kan. at 662.

We note PIK Crim. 4th 54.120 modified this pattern instruction to remove the flight from attempting to commit language. But the felony-murder instruction given in Brown's trial was an accurate statement of the law as previously noted in *Griffin* and, unlike in *Griffin*, was also factually appropriate given the evidence presented at Brown's trial, *i.e.*, the jury could have concluded Brown shot Sappington to facilitate her escape after he interrupted her failed attempt to steal his car. The instruction was not error.

FELONY-MURDER ALTERNATIVE MEANS

Brown argues her convictions must be reversed because K.S.A. 21-3401(b) set out alternative means of committing felony murder; and the State failed to present evidence of each alternative means, *e.g.*, that she killed Sappington while committing aggravated robbery and while attempting to commit aggravated robbery. This argument is readily disposed of by our decision in *State v. Cheffen*, 297 Kan. 689, 303 P.3d 1261, *cert. denied* 134 S. Ct. 627 (2013). In *Cheffen*, we held killing a person while committing, attempting to commit, or fleeing from an inherently dangerous felony are not alternative means of committing felony murder. 297 Kan. at 702. Brown offers no argument as to why *Cheffen* is in error. We hold this argument is without merit.

18

Brown next argues the State failed to present sufficient evidence to support her attempted aggravated robbery conviction because the evidence established her taking of Sappington's car was complete when she fatally shot Sappington. In other words, she contends there was no evidence of an attempted taking, only a completed one.

*Standard of Review*

> "When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *State v. Qualls*, 297 Kan. 61, 66, 298 P.3d 311 (2013) (citing *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 [2011]).

*Discussion*

At the time of Brown's crime, aggravated robbery was defined as "a robbery . . . committed by a person who is armed with a dangerous weapon or who inflicts bodily harm upon any person in the course of such robbery." K.S.A. 21-3427. A "[r]obbery is the taking of property from the person or presence of another by force or by threat of bodily harm to any person." K.S.A. 21-3426. "An attempt is any overt act toward the preparation of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 21-3301(a).

"[T]o constitute a taking, the prospective robber must have obtained at some particular moment the complete, independent, and absolute possession and control of the

thing desired adverse to the rights of the owner therein." *State v. Valdez*, 266 Kan. 774, 786, 977 P.2d 242 (1999). Asportation is not required to complete a taking. 266 Kan. at 787 (holding that taking of car had occurred when owner's unconscious body in back seat of vehicle). A taking is incomplete when it "is immediately resisted by the owner before the thief can remove [the property] from the premises or the owner's presence." *State v. Long*, 234 Kan. 580, 586, 675 P.2d 832 (1984).

Brown claims the State presented no evidence she failed to obtain possession and control over Sappington's vehicle. We disagree. One witness testified she heard an argument during the incident. And in the process of rolling to its final stopping place, the vehicle struck a fire hydrant on one side of the road and a light pole on the other. Another witness saw Brown abandon the vehicle immediately after it crashed. Sappington's body was found with the torso lying on the driver's seat. From this evidence, a reasonable factfinder could conclude Brown failed to complete the taking of Sappington's vehicle because Sappington's resistance or his body's position after the shooting prevented her from obtaining possession of and control over the car.

Brown contends the taking was complete as a matter of law the instant she shot Sappington because Sappington was immediately incapacitated and, in her view, the presence of the vehicle owner's incapacitated body inside a vehicle does not "qualify the taking." She relies on *Valdez*, but that case stands only for the proposition that defendants' possession of the victim's car keys, alone, did not constitute a taking of the vehicle. We can find no support for the broad, bright-line rule Brown proposes—that a taking always occurs when a would-be robber is present somewhere inside a vehicle at the same time as the vehicle owner's incapacitated body.

We hold there was sufficient evidence that Brown tried to but failed to take Sappington's car. In turn, we hold the evidence was sufficient to support Brown's attempted aggravated robbery conviction.

20

## PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENTS

Brown argues the prosecutor committed reversible misconduct by repeatedly referring to her testimony as a "story" or "tale." She objects to two statements made during the State's closing argument:

First, the prosecutor said:

"[A witness] then heard the car take off. Shortly after she hears this confrontation between these two people, she hears the car take off. She told the police, back when it was fresh in her mind over two years ago that she heard gunshots after the car took off and then she saw the car crash.

"She turned momentarily to tell her mom to call 911, and then she went back out, went to look at the crash. *Remember the things [Brown] says because they're not consistent—her tale that she happened upon the car after it crashed.* That's not what [the witness] saw." (Emphasis added.)

Later, the prosecutor said:

"You have Ke'Aira Brown's DNA and a fingerprint of hers on [Sappington's] car. *Now, she's had two years, a little over—two years and three months to come up with a story about how she's going to explain that to the jury.* How am I going to explain my DNA in the car? How am I going to explain my fingerprint in that car?

"*She had all weekend this past weekend to decide how she's going to respond to all of the evidence that she heard here in the courtroom last week. And she comes up with this story that she's trying to help Scott Sappington, that she just happened upon this car wreck and saw him there, went to the driver side around to the passenger side, opened it up because that will explain DNA and my fingerprint.* But then she didn't. She said she was trying to help Scott Sappington but she didn't. She don't stop and try to get a

21

neighbor to call 911. She didn't try to render any assistance. She just shook him according to her. She did nothing to help him." (Emphasis added.)

Brown argues the emphasized language was impermissible commentary about her credibility. We agree.

*Standard of Review*

Appellate review of a prosecutorial misconduct claim based on improper comments requires a two-step analysis. First, an appellate court decides whether the comments at issue were outside the wide latitude a prosecutor is allowed, *e.g.*, when discussing evidence. If so, there was misconduct. Second, if misconduct is found, an appellate court determines whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2013).

Prosecutors enjoy wide latitude in crafting closing arguments. *State v. Scott*, 271 Kan. 103, 114, 21 P.3d 516 (2001) (citing *State v. Miller*, 268 Kan. 517, Syl. ¶ 4, 997 P.2d 90 [2000], *cert. denied* 534 U.S. 1047 [2001]). But that latitude does not extend to a prosecutor stating a personal opinion that the defendant's testimony is untruthful. *State v. Akins*, 298 Kan. 592, 608, 315 P.3d 868 (2014).

Appellate courts consider three factors in analyzing the second step:  (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. But none of these factors individually controls; and before the third factor can override the first two, an appellate court must be able to say the harmlessness tests of both K.S.A. 60-

261 and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), have been met. *State v. McCullough*, 293 Kan. 970, 990-91, 270 P.3d 1142 (2012).

When both constitutional and nonconstitutional errors clearly arise from the same acts and omissions, an appellate court begins with a harmlessness analysis of the constitutional error. If the constitutional error is reversible, an appellate court need not analyze whether the lower standard for harmlessness under K.S.A. 60-261 also has been met. *Bridges*, 297 Kan. 989, Syl. ¶ 16. Under both standards, the party benefitting from the error bears the burden to demonstrate harmlessness. *Herbel*, 296 Kan. at 1110.

*Discussion*

A prosecutor is forbidden from offering a personal opinion that the defendant's testimony is untruthful. *Akins*, 298 Kan. at 608. The rationale for this rule "'is that expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony, not commentary on the evidence of the case.'" *State v. Graham*, 277 Kan. 121, 128-29, 83 P.3d 143 (2004) (quoting *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 [2000]). The prohibition extends not only to using the word "lie" but also to its "derivative." See *State v. Elnicki*, 279 Kan. 47, 62, 105 P.3d 1222 (2005) (prosecutor called defendant's testimony a "fabrication," "yarn," "final yarn," "the yarn spun here," and "four-part yarn"); see also *Akins*, 298 Kan. at 607 (prosecutor asked did the jury "buy" defendant's story and said his testimony was "not credible").

But prosecutors are permitted "to point out inconsistencies in a defendant's statements and to argue evidence that reflects poorly on a defendant's credibility." *Akins*, 298 Kan. at 608; see *State v. Duong*, 292 Kan. 824, 831-32, 257 P.3d 309 (2011) (not improper commentary on credibility to identify specific evidence supporting wholly-evidence-based argument victim's testimony was more believable than defendant's). The

comments are considered in the context in which they were made, not in isolation. *Duong*, 292 Kan. at 831.

We hold the prosecutor's statement that Brown had the weekend to "decide" how to testify in response to the evidence against her was misconduct. The clear thrust to such a statement was that Brown must have lied because an honest person does not have to "decide" what the truth is. And in this case the prosecutor seasoned this suggestion by referring to Brown's testimony as a "tale" and a "story." Given our caselaw, a prosecutor's time during closing arguments is better spent discussing the evidentiary strengths of the case at hand, rather than devising different ways to euphemistically accuse a criminal defendant of lying on the witness stand.

Having found misconduct, the next step is applying the three factors used to determine whether the misconduct denied Brown a fair trial. First, we must determine if the misconduct was gross and flagrant. *Bridges*, 297 Kan. at 1012-13. Often in examining this factor, we assess whether the statement is contrary to a longstanding rule of law. See *State v. Kemble*, 291 Kan. 109, 121-25, 238 P.3d 251 (2010) (factors determining gross and flagrant conduct include repeated comments, emphasis on an improper point, planned or calculated statements, violation of a well-established rule, and violation of a rule designed to protect a constitutional right); see also *Bridges*, 297 Kan. at 1015-16 (prosecutor's conduct was gross and flagrant because it violated the well-established rule prohibiting comments on the defendant's credibility). Under the second factor, it must be determined whether the prosecutor's statement was a result of ill will. A prosecutor's ill will is often "'reflected through deliberate and repeated misconduct . . . .'" *State v. Inkelaar*, 293 Kan. 414, 430, 264 P.3d 81 (2011).

We conclude the misconduct was gross and flagrant because it runs afoul of our long-standing rule against a prosecutor's personal commentary on witness credibility. Moreover, the comments were calculated to highlight this point by emphasizing not only

Brown's opportunity to invent her testimony in the time between the crime and trial but also her opportunity to refine it to address the evidence the State presented in its case-in-chief.

But we do not believe the improper statements were motivated by ill will. Despite Brown's argument that the prosecutor engaged in repeated misconduct, the record reflects offending statements occurred only once in a limited portion of the prosecutor's argument. And the transcript reflects the prosecutor attempted to tether her assertions about the falsity of Brown's testimony to evidence conflicting with the account.

Lastly, we consider whether the evidence against Brown was so direct and overwhelming that the misconduct would likely have little weight in the minds of the jurors. We conclude there is no reversible error.

Brown attempts to characterize the trial as a credibility contest, but the evidence of Brown's guilt came from multiple sources and was overwhelming despite her testimony. A neighbor saw a person fitting Brown's description walking toward Sappington's car, heard an argument, and saw the car crash. Another neighbor heard the crash, looked outside, and saw a person fitting Brown's description fleeing on foot. Brown's own testimony, DNA evidence, and fingerprints confirm she was the person these witnesses saw. The same evidence places Brown inside Sappington's car after he was shot but before anyone else arrived on the scene. Yet neighbors, passers-by, and first responders all arrived within minutes. No witness—including Brown—saw anyone else in the moments immediately before and after Sappington was shot at point-blank range who could have committed these crimes. Meanwhile, Brown fled the scene and abandoned her blood-soaked clothes several blocks away.

On this evidence, we hold there is no reasonable possibility the prosecutor's improper commentary affected the trial's outcome. *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

MANDATORY HARD 20 LIFE SENTENCE IMPOSED ON JUVENILE OFFENDER

Finally, Brown argues her hard 20 life sentence must be vacated because the sentencing scheme under which it was imposed violates the Eighth Amendment to the United States Constitution by preventing the sentencing court from taking into account a minor defendant's age before imposing it. We disagree.

A person convicted of felony murder is subject to a mandatory sentence of life imprisonment. See K.S.A. 21-4706(c). A person serving a life sentence for a felony murder committed after July 1, 1999, becomes parole eligible after 20 years of confinement. K.S.A. 22-3717(b)(2).

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments." "Embodied in the Constitution's ban . . . is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" *Graham v. Florida*, 560 U.S. 48, 59, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). From the proportionality principle flows certain categorical rules concerning punishment of juveniles. The United States Supreme Court has held that the death penalty cannot be imposed on offenders who were under 18 at the time of their crimes and that a non-homicide offender who was under 18 at the time of the offense cannot be subject to a prison sentence of life without the possibility of parole. See *Miller v. Alabama*, 132 S. Ct. 2455, 2458, 183 L. Ed. 2d 407 (2012) (citing *Graham*, 560 U.S. at 82, and *Roper v. Simmons*, 543 U.S. 551, 578, 125 S. Ct. 1183, 161 L. Ed. 2d 1 [2005]).

26

The Court has also held the finality of the death penalty differentiates it from sentences of imprisonment such that "in capital cases the fundamental respect for humanity underlying the Eighth Amendment [citation omitted] requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensible part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976).

Recently the Court extended *Woodson*'s individualized sentencing requirement and held mandatory life-without-parole sentences violate the Eighth Amendment when imposed on defendants who were under 18 at the time of their crimes. See *Miller*, 132 S. Ct. at 2475. It reasoned that this result was compelled by (1) its caselaw imposing categorical restrictions in the context of sentencing juveniles based on juveniles' lesser degree of culpability and the severity of the crime being sentenced; and (2) its caselaw analogizing juvenile life without parole sentences to capital punishment. 132 S. Ct. at 2464-67. The Court's decision does not "foreclose a sentencer's ability [to sentence a juvenile to life without parole] in homicide cases, [but] require[s] it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." 132 S. Ct. at 2469.

Brown asks us now to extend the Court's *Miller* decision and hold mandatory life-with-parole sentences are unconstitutional as applied to persons who were under 18 at the time they committed their crimes. We decline to do so because *Miller*'s rationale is inapplicable. The parallels between life-without-parole sentences and the death penalty that made *Woodson* applicable in *Miller* are not present in this case. A hard 20 life sentence does not irrevocably adjudge a juvenile offender unfit for society. Rather, in line with the concerns expressed in *Graham*, it gives the offender a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" by permitting parole

27

after the mandatory 20-year minimum prison term is served. See *Graham*, 560 U.S. at 75; see also K.S.A. 22-3717(b)(2). Brown's constitutional challenge is without merit.

Affirmed.

MORITZ, J., not participating.

GERALD T. ELLIOTT, District Judge, assigned.[1]

[1]**REPORTER'S NOTE:** District Judge Elliott was appointed to hear case No. 106,111 vice Justice Moritz pursuant to the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.