NOT DESIGNATED FOR PUBLICATION

No. 115,635

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STEVEN JACKSON,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.


MEMORANDUM OPINION

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed March 24, 2017.
Affirmed.

*Shannon S. Crane*, of Hutchinson, for appellant.

*Thomas R. Stanton*, deputy district attorney, *Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before PIERRON, P.J., HILL, J., and WALKER, S.J.

*Per Curiam*:  Steven Jackson appeals from the district court's denial of his K.S.A. 60-1507 motion after an evidentiary hearing. Jackson contends that this court should reverse the district court's denial of the motion because his trial counsel was ineffective. We disagree and affirm the district court's denial of his K.S.A. 60-1507 motion.


FACTS

In March 2009, Jackson was charged with battery against a state corrections officer or employee. Jackson was accused of intentionally causing physical contact to

1

corrections counselor Keith Anderson in a rude, insulting, or angry manner while Anderson was engaged in the performance of his duties and that this contact was done by Jackson in custody of the Secretary of Corrections. The incident occurred in January 2009 while Jackson was an inmate in the Hutchinson Correctional Facility, serving a 146-month sentence for an unrelated conviction. At the time of the incident, Jackson had served approximately 62 months of his sentence.

Jackson applied for appointed defense services in April 2009. By May 2009, Lee Timan was on record as Jackson's court-appointed attorney. Trial was set for September 2009. However, Timan was granted several continuances to allow himself more time to investigate and prepare for trial.

Although represented, in September 2009 Jackson filed a pro se motion to dismiss based on double jeopardy, arguing that he had already been disciplined within the prison for his conduct. Timan formalized Jackson's pro se motion to dismiss on the same grounds in October 2009. Timan also filed a motion in limine seeking to prevent the State from referring to Jackson's prior criminal convictions.

Jackson's 2-day trial took place in April 2010. At close of the State's case-in-chief, Timan unsuccessfully moved for a directed verdict of acquittal arguing that the State had not presented a prima facie case. Prior to presenting the defense's case-in-chief, Timan stated that Jackson planned to testify on his own behalf and requested that the district court review with Jackson his rights prior to his testimony. Then, at the closing of the defense's case, Timan renewed his motion for a directed verdict of acquittal arguing that the jury would not be able to find Jackson guilty on the elements. Once again the district court found that the State met its burden and denied the motion. Finally, to preserve the issue for appeal, Timan renewed Jackson's motion to dismiss based on double jeopardy, which the court also denied.

The instructions to the jury included that it would need to make determinations regarding the weight and credibility of the evidence, including testimony; the jury members were to presume Jackson was not guilty until the evidence convinced each of them otherwise; described the standard of reasonable doubt; stated that each element of the crime must be proved beyond a reasonable doubt; and the verdict must be founded on evidence that has been admitted, and the verdict must be unanimous. After deliberations, Jackson was convicted.

Prior to sentencing, Timan filed a motion for a new trial arguing that the State had not met its burden in proving each element of the crime beyond a reasonable doubt. The court likewise denied this motion. In anticipation of sentencing, Timan filed a motion for downward departure which was also denied by the district court at the sentencing hearing. Jackson spoke at his sentencing hearing, and stated, "I was trying to batter the inmate and I wasn't trying to give up . . . [but] I didn't hit [Anderson] intentionally." The district court sentenced Jackson to the standard sentence of 130 months based on his criminal history score of A, to be served consecutive to his existing prison term. Timan filed a timely notice of appeal on behalf of Jackson.

In Jackson's direct appeal, he argued that he was deprived of his statutory right to a unanimous verdict because, although the jury was instructed to find whether Anderson was a state correctional officer or employee, the State failed to present evidence that Anderson was a correctional *officer*. Under standard Kansas Department of Corrections (KDOC) nomenclature, a correctional counselor such as Anderson is a correctional employee, not a uniformed officer. Jackson argued, essentially, that the alternatives for Anderson's employment status were "'alternative means of the commission of the crime.'" *State v. Jackson*, No. 104,561, 2011 WL 4440416, at *2 (Kan. App. 2011) (unpublished opinion). A panel of this court noted: "One fact was uncontroverted at trial: Anderson was a 'correctional employee,' not a 'correctional officer,' at the time of the altercation."

2011 WL 4440416, at *1. The panel affirmed Jackson's conviction. 2011 WL 4440416, at *5.

Jackson filed a timely K.S.A. 60-1507 motion. In the accompanying memorandum in support, Jackson alleged several examples of Timan's ineffectiveness based on his failures to take or not take certain actions at his trial. Jackson alleged, in part: (a) Timan failed to research and understand KDOC's policies and procedures as they applied to the duties of a corrections counselor (Anderson's job title); (b) by calling Officer Elizabeth Aragon as a defense witness, Timan undermined Jackson's defense as her testimony supported the State's case; (c) Timan failed to conduct an adequate investigation of the underlying facts of the case; and (d) Timan's cumulative errors rose to the level of ineffective assistance of counsel.

Following the appointment of counsel for Jackson, in July 2015 the district court held a hearing on Jackson's K.S.A. 60-1507 motion. At that hearing, Jackson proffered into evidence the disciplinary reports from his internal hearing at the prison in early 2009, DVDs of the same video footage of the altercation shown at trial which were reviewed by the disciplinary hearing officer, Lieutenant J.Q. Martin, as well as Anderson's job description in effect as of January 2009.

Jackson's K.S.A. 60-1507 attorney also called Timan to the stand. Timan testified that he met with Jackson approximately five times in addition to meetings coinciding with court appearances. Timan's testimony regarding the specific allegations is summarized as follows:

- The decision to not proffer KDOC's policies and procedures: Timan recognized that the policies and procedures would only be probative on whether the officers acted appropriately in their response to the incident, which was not an issue at trial. Timan testified that he did not consider the policies

4

informative as to the issue of Jackson's guilt. The only defense issue regarding Anderson's actions had to do with whether he was acting as a correctional *officer* at the time of the incident; this was discussed with Jackson, who indicated to Timan he realized it would not make a legal difference whether Anderson was defined as an officer or an employee. Nevertheless, Timan raised the issue of Anderson's title and duties at trial with each of the State's witnesses, attempting to distance Anderson's duties from those of a correctional officer.

- Timan's factual investigation:  Timan specifically requested that his investigator contact two potential witnesses in accordance with Jackson's suggestions. The potential witnesses were Lieutenant Martin, the hearing officer who presided over his internal disciplinary hearing at the prison, and a fellow inmate, Willy Griffin-Green, who claimed to have seen the altercations from his cell. Timan also wanted to talk with Officer Aragon, who was assigned to the response team on the day in question. Timan said that he considered calling Lieutenant Martin because Martin's statement about what he viewed in the video footage suggested he saw a third camera angle that had not been produced to the defense. However, Timan realized Martin's testimony would not be helpful to Jackson's case and it would more likely be helpful to the prosecution. Timan acknowledged that there was no other indication of a third video and that if the State had had a clearer video, there was no reason to not show it.

- The decision to call Officer Aragon as a defense witness:  Timan testified that he and Jackson discussed trying to find a witness who would be able to say that Jackson did not punch Anderson. It was inmate Griffin-Green who told Jackson that Aragon might be a good witness for the defense; Jackson wanted to call her to the stand with the hope she would cast doubt on his guilt. Timan

5

testified—over hearsay objections—that his investigator "got a feeling" that Officer Aragon could be helpful but was a reluctant witness. Aragon's demeanor with the investigator suggested she could be helpful. But otherwise Aragon would have simply stated that she saw what the other officers saw. Timan acknowledged that his defense of Jackson was relying primarily on inmate Griffin-Green, which presented an automatic credibility problem. Timan's decision to call Aragon was tactical in that Jackson had "no real defense," and she could not hurt Jackson's case as much as she could potentially help it. Timan calculated that once she was under oath, she would actually help, and he believed that not calling her would have been ineffective as an abandonment of a possible defense.

After Timan testified, Jackson testified that he met with Timan "various times" at the prison and prior to court appearances and that the theory of his case was his innocence because he did not intentionally batter Anderson. Jackson testified that if Timan had proffered the KDOC operating procedures, it would have demonstrated to the jury that Anderson was not acting within the scope of his duties (an element of the crime) by trying to break up the fight. Jackson testified that he believed there was "foul play" because Lieutenant Martin swore that he saw Jackson swinging at Anderson on a video that was never produced to the defense. Jackson also testified that he discussed with Timan calling Officer Aragon to the stand, that he wanted Timan to call Aragon as a witness, but that she was a reluctant witness.

At the conclusion of the hearing, the district court denied Jackson's K.S.A. 60-1507 motion and made specific findings of facts on the record. The court found: that Timan thoroughly investigated the matter; that Timan's testimony was credible; that the suspicion of a third tape was based entirely on supposition; and that there was "nothing wrong in the professional judgment used by Mr. Timan in regards to calling and not calling the witnesses." The court also acknowledged that Anderson was not a correctional

6

officer although he had been one in the past. Based on reading the job descriptions in evidence at the hearing, the court found that Anderson acted within the scope of his duties:

> "If you actually, if you read the exhibits on his position description you can, without much difficulty, find that is within his description when he's supposed to work with inmates and supposed to interact with the offenders to disrupt antisocial behavior and reinforce appropriate reactions. It clearly states in his job situation that he's in a violent occupational hazard with possible death being resulted by being assaulted and other means. He's in a maximum security prison. And that issue was raised [at trial]."

The judge found that Anderson was a correctional employee as envisioned by the statute, and this was brought out at trial by the witnesses and the victim. The court clarified that Lieutenant Martin did not say that he saw Jackson hitting Anderson on the video, but rather, "there appeared, appears to be a swing." The district court judge found no ineffectiveness of counsel and stated that even if the factors Jackson complained of were changed, "I cannot see in my mind how that would have in any way affected the outcome of the case." Jackson filed a timely notice of appeal.

ANALYSIS

At the outset, we note that Jackson's initial pro se K.S.A. 60-1507 motion alleged ineffective assistance of both trial counsel and appellate counsel. His amended motion reiterated allegations of ineffective assistance of both trial and appellate counsel. However, at Jackson's hearing in district court on his motion, his attorney stated that the main issue in his motion was his allegation of ineffective assistance of trial counsel.

At Jackson's hearing, he did not call as a witness his appellate counsel from his direct appeal, nor did he make any argument regarding the ineffectiveness of his appellate

7

counsel in his closing argument at the hearing. The entire focus of the closing argument was on ineffective assistance of trial counsel.

Further, Jackson's appeal from the district court's ruling on his K.S.A. 60-1507 motion (written by the same attorney who represented him at the hearing) raises only one issue: ineffective assistance of trial counsel. An issue not briefed by the appellant is deemed waived or abandoned. *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011). Consequently, we will treat the issue of ineffective assistance of appellate counsel as having been abandoned by Jackson.

After a full evidentiary hearing on a K.S.A. 60-1507 motion, the district court must issue findings of fact and conclusions of law concerning all issues presented. Supreme Court Rule 183(j) (2017 Kan. S. Ct. R. 222). Appellate courts then review the district court's findings of fact to determine whether they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. Appellate review of the district court's ultimate conclusions of law is de novo. *State v. Adams*, 297 Kan. 665, 669, 304 P.3d 311 (2013). Substantial competent evidence is evidence that possesses both relevance and substance and that furnishes a substantial basis of fact from which the issues reasonably can be resolved. *State v. Brown*, 300 Kan. 542, 546, 331 P.3d 781 (2014).

On appeal, Jackson raises only one issue: Timan was ineffective in representing Jackson at his trial. Jackson alleges Timan's ineffectiveness is manifested by not conducting a thorough investigation, not proffering Anderson's job description into evidence at trial, not calling Martin to the stand to explain his assessment of the video tapes of the incident, which suggested there was a third tape, and calling Officer Aragon to the stand when she was a reluctant witness.

8

Like the standard of review for a K.S.A. 60-1507 motion, a claim alleging ineffective assistance of counsel presents mixed questions of fact and law. Appellate courts review the district court's factual findings for support by substantial competent evidence and review its legal conclusions based on those facts de novo. *State v. Bowen*, 299 Kan. 339, 343, 323 P.3d 853 (2014).

To prevail on his claim of ineffective assistance of counsel, Jackson must establish (1) that the performance of defense counsel Timan was deficient under the totality of the circumstances and (2) that Jackson was prejudiced by counsel's deficiency, *i.e.*, that there is a reasonable probability the jury would have reached a different result absent the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014) (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984]).

Regarding the first prong, judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). Then, to establish the second prong of prejudice, the defendant must show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different, with a reasonable probability meaning a probability sufficient to undermine confidence in the outcome. *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015).

If counsel made a strategic decision after making a thorough investigation of the law and facts relevant to the realistically available options, then counsel's decision is virtually unchallengeable. Strategic decisions made after a less than comprehensive investigation are reasonable exactly to the extent a reasonable professional judgment supports the limitations of the investigation. *State v. Cheatham*, 296 Kan. 417, 437, 292

9

P.3d 318 (2013) (citing *Strickland*, 466 U.S. at 690-91). Decisions on which witnesses to call, what trial motions to make, and all other strategic and tactical decision are the exclusive province of counsel after consultation with the client. See *Bledsoe v. State*, 283 Kan. 81, 92, 150 P.3d 868 (2007).

*Failure to conduct a thorough investigation*

In finding that Timan's investigation of the case was not ineffective assistance of counsel, the district court judge noted his own recollection of the case as the presiding judge during the trial and found that Timan testified credibly regarding the steps he took in his investigation and the decisions he made in consultation with Jackson, even noting that Timan did more for his client than many defense attorneys do. The record demonstrates that for each claimed deficiency in the investigation, *i.e.*, not proffering the KDOC regulations or Anderson's job description and not chasing down the suspected third tape, Timan testified regarding his reasons for making those decisions, reflecting an awareness of the defense's realistic options. The district court found Timan's decisions to be within the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance."

On appeal, Jackson claims that "the main thrust" of his defense at trial was that Anderson was not acting within his duties as a correctional counselor by attempting to break up the fight. If this had been his theory of defense, then the KDOC regulations (or, more specifically, Anderson's job description) and whether there was a third video tape might have played a role in his defense. However, the record is clear that Jackson's defense theory at every stage of his case was his innocence or even that Anderson was the aggressor while trying to break up the fight between Jackson and the other inmate. For example, at trial, Jackson testified, "[Anderson] was frustrated because he was the only guard [*sic*] at the time and he was trying to separate [us] and he couldn't. . . . [H]e did what he had to as far as trying to separate us. . . . [H]e was trying to do his job." At

10

sentencing, Jackson stated, "I didn't strike [Anderson] intentionally. . . . I was trying to batter the inmate and I wasn't trying to give up." On his direct appeal, the issues were Jackson's intent and whether Anderson was a correctional officer or employee for an alternative means analysis. At his K.S.A. 60-1507 hearing, Jackson testified that his defense theory at the time of trial was that he "was innocent."

This court starts with the presumption that Timan's decisions regarding the KDOC regulations, a formal job description, and the third tape were proper. See *Kelly*, 298 Kan. at 970. Given that Jackson's core theory of his case through his K.S.A. 60-1507 hearing was his innocence and/or lack of intent to batter Anderson, neither the KDOC regulations nor Anderson's job description would have provided any context for the jury as to whether Jackson battered Anderson, nor would running the risk of uncovering a video tape that could have more clearly showed Jackson's attack on Anderson support his innocence. Anderson's duties were addressed with every one of the State's witnesses at trial in order to distinguish officers from other employees, such as Anderson. Jackson has not shown that Timan lacked information based on an ineffective investigation, nor has he demonstrated Timan's decisions regarding the KDOC regulations, Anderson's job description, and the third tape were not the product of strategy consistent with the theory of Jackson's defense. See *Sola-Morales*, 300 Kan. at 888. The district court therefore properly concluded that Timan was not ineffective for failing to conduct a more thorough investigation.

*Failure to call Lieutenant Martin to the stand*

In finding that Timan was not ineffective for failing to call Lieutenant Martin to the stand to address Martin's comment in Jackson's disciplinary report (a document not introduced at trial) and the belief that this comment implied the presence of a third video tape of the incident, the district court clarified Martin's comment and found that there was no evidence to support the existence of a third tape. The district court suggested that

Martin's comment was consistent with the two tapes in evidence because the altercation moved out of frame for a time and Martin only said that it appeared as though Jackson took a swing at Anderson, stating that "Officer Martin did not say he said there was a swing." The district court concluded that Timan's decision to not call Martin to question him regarding a third tape was a reasonable and competent exercise of his professional judgment and trial strategy.

Jackson argues that Martin should have been called by Timan to explain his assessment of the video tapes of the incident which was written in the internal disciplinary report after Jackson's disciplinary hearing. Jackson claims Martin wrote in a disciplinary report that the video Martin watched showed Jackson take a swing at Anderson, thus suggesting there was a third tape that had a clear viewing angle of the altercation. Jackson argues that calling Martin as a witness on this inconsistent comment "clearly would have affected the credibility of the officers who testified at trial" and "easily" demonstrated that the officers who testified at trial that they witnessed Jackson batter Anderson were covering for Martin—showing that if one officer lied, then the other officers could be lying as well.

Jackson's argument is based on the misinterpretation of Martin's comment in the disciplinary report. This misinterpretation was also made by Timan during his representation of Jackson, as suggested by his testimony at the K.S.A. 60-1507 hearing:

> "A.   Are you referring to the portion of the testimony where Officer Martin is recalling what he could see on video?
> "Q.   Yes.
> "A.   When he's talking about seeing Officer Anderson attempting to break them up, what appears to be a swing . . . .
> "Q.   Yeah.
> "A.   . . . [T]hat led me to believe that either officer, when I—what I remember at the time was my state of mind was thinking either there is another video out there

12

which doesn't sound like it's going to be very helpful for Mr. Jackson because of what Mr. Martin is claiming he saw on it, or Mr. Martin is exaggerating or being less than truthful, but it's an administrative hearing. It's not, you know, evidence presented at the administrative hearing is not going to be necessarily evidence presented at trial. . . . But it certainly did at the time made me believe there was evidence that the prison was perhaps not providing, but I wasn't so sure that it was going to be helpful to our defense necessarily.

"Q.   . . . [Y]ou did not call Officer Martin to testify either in the preliminary or in the trial?

. . . .

"A.   . . . [M]y failure to call Officer Martin was because either, either he was not going to be helping us, or he was going to be saying evidence that was actually going to be more helpful for the state. I[t] did not ever at any time come into evidence or any statements from Officer Martin that were going to vindicate Mr. Jackson in any way. It was either going to be he had nothing to add, or it was going to be that he, it was another witness saying that this altercation did happen.

. . . .

"Q.   . . . [T]here wasn't any indication that there was, or any evidence that there was a third tape or a third camera?

"A.   No. The only thing that ever led us to believe there might be is the fact that Officer Martin made statements in his disciplinary report that were not consistent with the video footage we have. . . .

. . . .

"Q.   Either way it wasn't going to help you?

"A.   No. There was nothing, no indication from Officer Martin that he was in any way going to be a helpful witness for us. It was really more about whether he was the smoking gun of there being a third video but it was the video footage that didn't sound like it was going to be helpful for us."

Timan further explained his reasoning for not calling Martin by noting that pointing out the perceived inconsistency would have given Martin an opportunity to say he had merely made a mistake in the way he had written the disciplinary report. He also indicated that the value of questioning a witness who was not present during the incident

13

would have been slight when compared with the testimony of the several officers who offered eyewitness testimony.

Lieutenant Martin's comment in the disciplinary report, entered into evidence at the K.S.A. 60-1507 hearing, was: "[The video footage] shows CCI Anderson attempting to break the participants up, *what appears to be a swing at CCI Anderson*, and the intervention of several other staff responding." (Emphasis added.) Timan suggests by his testimony that had he called Martin as a defense witness, it is less likely that the jury would have found the officer-witnesses lacking in credibility and more likely that Martin would have pointed to the video in evidence and reiterated where it appeared Jackson swung at Anderson.

Jackson has not met his burden to prove that Timan's actions in deciding to not call Martin were not the product of strategy. He has also failed to show that, but for Timan's failure to call Martin to the stand, the outcome of the proceeding would have been different.

*Calling Officer Aragon to the stand*

In finding that Timan was not ineffective for calling Officer Aragon to the stand to address what she witnessed on the day of the incident, the district court found that Timan used his judgment. Acknowledging that it was easy to say, in hindsight, that "maybe we should have tried something different," the district court concluded that there was nothing wrong with Timan's professional judgment in calling Aragon.

Jackson argues that Timan should not have called Aragon without having a better idea of what she was going to testify to at trial. Jackson claims that because Aragon was a reluctant witness, she should not have been called, and he characterizes her testimony as "the final nail in the coffin of the defense's case."

14

At trial, Aragon testified that she was the last officer to respond to the Signal 30 (staff in need of assistance) alarm and she did not see Jackson hit Anderson, nor did she see Anderson get hit, but that Anderson's reactions suggested he had been battered, and that Anderson told her Jackson struck him. In the context of trial testimony by the State's witnesses, the weight of Officer Aragon's testimony could be interpreted as a net-zero impact. However, it is not the result of witness testimony that determines ineffective assistance of counsel. See *Sola-Morales*, 300 Kan. at 882.

The Kansas Supreme Court has stated: "Even though experienced attorneys might disagree on the best tactics or strategy, deliberate decisions based on strategy may not establish ineffective assistance of counsel. [Citation omitted.]" *Flynn v. State*, 281 Kan. 1154, 1165, 136 P.3d 909 (2006). In this case, Timan described his thought process in deciding to call Officer Aragon: the only defense witness besides Jackson was another inmate; Aragon's demeanor and reluctance to get involved suggested she did not share the same perception of the event as the State's witnesses; Timan clearly communicated to Jackson that he intended to call Aragon, and Jackson agreed with that decision because it appeared Aragon could help his case far more than she could hurt it; and finally, to not call her when the potential benefit outweighed the potential harm would be to abandon a significant piece of testimonial evidence for the defense.

Timan made a calculated, strategic decision. Jackson has not met his burden to prove that Timan's actions were not the product of strategy. Jackson has also failed to show that, but for Timan's decision to call Officer Aragon to the stand, the outcome of the proceeding would have been different.

As Jackson has not met his burden to demonstrate that Timan's actions were not within the broad range of reasonable professional assistance or the product of strategy, there is no accumulation of errors. Jackson has not overcome the presumption of reasonableness that the district court appropriately afforded Timan. The district court's

15

findings of fact in its determination that Jackson did not receive ineffective assistance of counsel were based on substantial evidence.

Affirmed.