NOT DESIGNATED FOR PUBLICATION

No. 111,666

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TIFFANY C. HUBBARD,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; SALLY D. POKORNY, judge. Opinion filed February 12, 2016. Affirmed in part and vacated in part.

*Carol Longenecker Schmidt*, of Kansas Appellate Defender Office, for appellant.

*Patrick J. Hurley*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., MCANANY and BUSER, JJ.

BUSER, J.:  Tiffany C. Hubbard appeals from her convictions of two counts of distributing cocaine, two counts of criminal use of a communication facility, and one count of possession of cocaine. She raises five issues:  (1) The district court violated her statutory and constitutional right to be present at a critical stage of the proceedings when it held a motion in limine hearing in her absence; (2) The district court erroneously granted the State's motion in limine; (3) The district court erroneously admitted in evidence her license to operate an in-home daycare; (4) The prosecutor committed misconduct during closing argument; and (5) The district court improperly ordered her to

1

reimburse the State for laboratory testing related to charges which did not result in convictions.

We affirm Hubbard's convictions and vacate the laboratory fee assessment.

FACTUAL AND PROCEDURAL BACKGROUND

The State charged Hubbard with four counts of cocaine distribution, four counts of criminal use of a communication facility, and one count each of possession of drug paraphernalia and possession of cocaine with intent to distribute. The charges resulted from four controlled drug buys facilitated by a cooperating individual named James Beltch, and the execution of a search warrant at Hubbard's residence in Lawrence.

*The Cooperating Individual*

In late 2012, Sean Brown, a police officer for the Lawrence Police Department assigned to the Joint City/County Drug Enforcement Unit (DEU), received information that James Beltch, a federal parolee under supervision for a 2006 crack cocaine conviction, was selling drugs. Beltch had pled guilty to possession with intent to distribute cocaine and served about 4 years in a federal penitentiary. Officer Brown executed a search warrant at Beltch's residence and seized drug paraphernalia. Because Officer Brown knew that Beltch was having difficulties on parole, he encouraged him to work with law enforcement as a "[c]ooperating individual." Shortly thereafter, Beltch agreed to the proposal.

Other than offering to "speak on [his] behalf," Officer Brown did not make Beltch any promises in exchange for his assistance. When Beltch fulfilled the terms of his agreement, however, Officer Brown spoke to the U.S. Attorney and recommended that a new criminal case should not be filed against Beltch as a result of the incriminating items

2

seized from his residence. Of note, at the time of Hubbard's trial, Beltch was serving a 46-month federal sentence due to the revocation of his parole but the U.S. Attorney had not filed any new charges. Although Beltch testified that he also hoped to receive a reduction in his sentence in exchange for testifying against Hubbard, he claimed no one had made any such promises.

*The Controlled Drug Buys*

Because Officer Brown's previous attempts to target Fredrick Reese, a suspected drug dealer, had been unsuccessful and Beltch had purchased cocaine from Reese in the past, Officer Brown engaged Beltch to attempt some controlled drug buys from Reese.

*First Controlled Drug Buy*

On October 2, 2012, Officer Brown instructed Beltch to contact Reese to purchase illegal drugs. During the recorded phone call to Reese, Beltch asked for "50 minutes," ($50 worth of crack cocaine) or about half a gram of the drug. Reese referred Beltch to Hubbard, whom Beltch had met once before through Reese. Beltch made a recorded phone call to Hubbard, and she instructed him to come to her residence. At that location, Beltch gave Hubbard the buy money whereupon, according to Beltch, Hubbard gave him "a piece of a Dillon's baggie that had crack cocaine in it." Upon the completion of the transaction, Beltch handed Officer Brown a torn piece of a grocery bag, containing .37 grams of crack cocaine.

*Second Controlled Drug Buy*

On October 5, 2012, Sergeant Casey Cooper, another member of the DEU, conducted a second controlled drug buy with Beltch. After Beltch contacted Reese attempting to buy $50 worth of cocaine, Reese again referred Beltch to Hubbard. When Beltch contacted Hubbard, she agreed to meet him in the parking lot of a bar known as

3

the "Playerz Club." While awaiting Beltch's arrival at the club, a member of the DEU surveillance team observed Reese pull up alongside Hubbard's vehicle. Reese and Hubbard briefly conversed with one another, and Reese left the scene shortly before Beltch entered the parking lot.

Beltch parked next to Hubbard's vehicle, and because she was no longer inside the vehicle, he called her to let her know he had arrived. Beltch gave Hubbard the buy money and, in return, she gave him cocaine which was packaged in a small white plastic bag. After the transaction, Beltch handed Sergeant Cooper a small portion of a white grocery sack which contained .36 grams of cocaine.

*Third Controlled Drug Buy*

On October 11, 2012, Officer Brown asked Beltch to contact Reese and request $100 worth of cocaine. Similar to the other buys, Reese referred Beltch to Hubbard. Beltch made a recorded phone call to Hubbard, wherein she informed Beltch that he no longer needed to go through Reese and he could call her directly. Hubbard told Beltch to "come on by." After Beltch parked in Hubbard's residential driveway, she came out and gave him crack cocaine wrapped in a piece of paper. Beltch paid Hubbard $100 for the drugs. When the transaction was complete, Beltch handed Officer Brown a piece of paper with .96 grams of crack cocaine wrapped inside of it.

*Fourth Controlled Drug Buy*

The final controlled drug buy occurred on October 18, 2012. When Beltch contacted Hubbard, he requested "100 minutes" and Hubbard told him to "come on by." According to Beltch, Hubbard instructed him to come inside her residence. Once inside, Hubbard handed Beltch crack cocaine in a baggie. After the transaction, Beltch gave Officer Brown .96 grams of crack cocaine sealed in a baggie.

4

*The Search Warrant*

On October 24, 2012, the DEU executed a search warrant at Hubbard's residence. Officers found several items of interest, including a digital scale with cocaine and methamphetamine residue on it, and 4.22 grams of crack cocaine in some athletic socks in the master bedroom closet. Inside a suitcase in the master bedroom, officers located marijuana paraphernalia and a small bag of marijuana stems. Officers also seized a hunting license and a daycare license which showed Hubbard's name and residential mailing address.

*Jury Trial Proceedings*

At trial, Hubbard testified on her own behalf. Hubbard conceded that she used marijuana and that she started using crack cocaine when Reese, her former boyfriend, introduced her to the drug. Hubbard testified that Reese was in her home on the day prior to the execution of the search warrant, and she suggested that the cocaine in her closet and the scales seized by the officers belonged to him. Hubbard also introduced a factual stipulation indicating that on October 24, 2012, law enforcement officers executed a search warrant at Reese's residence and seized ankle socks, "'a small set of digital scales which appeared to have white powder residue," and a sandwich baggie with a corner cut off.

With regard to her cocaine habit, Hubbard explained that she would either obtain the drug from Reese's contacts or Beltch, whom she had known for about 1 year. Hubbard insisted, however, that she had never "sold any drugs in [her] life." In fact, despite Beltch's assertion to the contrary, Hubbard testified that during each of the drug buys she purchased crack cocaine from Beltch. According to Hubbard, when Beltch called her or Reese, he was actually using code words which referred to selling cocaine, rather than purchasing it.

5

The jury convicted Hubbard of distributing cocaine on October 11, 2012, criminal use of a communication facility on October 11, 2012, distributing cocaine on October 18, 2012, criminal use of a communication facility on October 18, 2012, and possession of cocaine. The jury failed to reach a unanimous verdict on the remaining counts, and the district court dismissed them. On January 31, 2014, the district court sentenced Hubbard to a controlling prison term of 14 months followed by 24 months' postrelease supervision. Hubbard filed this timely appeal.

## HUBBARD'S RIGHT TO BE PRESENT AT THE MOTION IN LIMINE HEARING

Prior to trial, the State filed a motion in limine, seeking to limit, among other things, defense counsel's questioning of Beltch. The State explained that during Hubbard's preliminary hearing, John Frydman, defense counsel, asked Beltch about whether he hoped to petition the U.S. Attorney to receive a reduction in his federal sentence because of his cooperation with the DEU in this case. Frydman also mentioned that he had previously represented Beltch.

Because the district court had resolved any possible conflict of interest, the State insisted this past legal representation was wholly irrelevant. Moreover, the State pointed out that during the preliminary hearing Frydman also inquired about having been contacted by Beltch's father to recommend an attorney. While the State acknowledged that the U.S. Attorney's decision not to file new charges and Beltch's hope to receive a sentence reduction qualified as relevant impeachment evidence, the State argued that any questioning about Beltch hiring an attorney or his father's referral request was irrelevant. Finally, the State insisted that while Beltch was also testifying in the "*Berlon Muse*" case, his involvement in that criminal case was irrelevant to the Hubbard charges.

On November 27, 2013, the district court held a hearing on the State's motion. Prior to this hearing, Frydman indicated, more than once, that Hubbard's personal

6

appearance in court posed a hardship for her. At the conclusion of Hubbard's preliminary hearing, for example, Frydman stated, "Well, if there are motions, obviously, I would have her here." But when discussing whether Hubbard planned to be present at the November 27 hearing, Frydman said, "I have not seen the [State's] motion [in limine]. I don't know that her appearance would be absolutely necessary." The district court decided to resolve the issue of Hubbard's appearance at the hearing on the motion. However, Hubbard did not appear at the hearing and her absence was not discussed.

At the hearing, the parties argued the merits of the State's motion in limine. Relevant to this appeal, Frydman agreed that the names of other investigations Beltch was involved in were irrelevant, but he argued that Beltch's work with the DEU on several cases was appropriate for cross-examination. The district court ruled that while questioning about the *Berlon Muse* case was improper, Frydman could conduct an "in depth" examination into "exactly what [Beltch] received versus what he was potentially facing" and Beltch's "future 'hopes' that his cooperation will then result in an even greater reduction of his sentence in the future." The district judge explained that she was the trial judge for the *Berlon Muse* case, and Beltch's participation in the case was irrelevant because Beltch's testimony at that trial indicated he did not receive additional consideration for participating in numerous DEU cases.

Regarding Frydman's previous representation of Beltch and the fact that he referred him or his father to another attorney, Frydman candidly agreed that introducing these facts into evidence would only serve to confuse the jury. But Frydman contended that questioning Beltch about his desire for a sentence modification from the U.S. Attorney and that his father "was or is or has contacted an attorney to assist him in this goal," should be allowed. The district judge ruled that while Frydman could ask Beltch if he had acquired or planned to acquire an attorney, questioning as to his attempts to obtain counsel went "too far afield."

7

For the first time on appeal, Hubbard contends that her absence from the hearing on the State's motion in limine violated both her constitutional and statutory right to be present at all critical stages of the proceedings. Generally, issues not raised before the district court, including constitutional grounds for reversal, are not properly before this court for review. *State v. Bowen*, 299 Kan. 339, 354, 323 P.3d 853 (2014). Although Hubbard concedes that she did not raise this issue below, she urges us to address her argument because it is a question of law arising on proved or admitted facts. See *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014) (stating exceptions to the general rule that appellate courts do not review issues of first impression).

Our appellate courts have considered for the first time on appeal issues involving a defendant's right to be present at critical stages of the proceeding. See *Bowen*, 299 Kan. at 354-58 (violation of procedure for answering jury questions); *State v. Hall*, No. 102,117, 2014 WL 3843066, at *2-3 (Kan. App. 2014) (unpublished opinion), *rev. denied* 302 Kan. ___ (2015) (restitution hearing). Consequently, we will consider the merits of Hubbard's argument.

Criminal defendants charged with a felony have a statutory right, under K.S.A. 22-3405(1), and a constitutional right, which "emanates from the Sixth Amendment right to confront witnesses and from the right to due process guaranteed under the Fifth and Fourteenth Amendments to the United States Constitution," to be present at all critical stages of their trial. *State v. Davis*, 284 Kan. 728, 731, 163 P.3d 1224 (2007); see K.S.A. 22-3405(1) ("The defendant in a felony case shall be present . . . at every stage of the trial . . . except as otherwise provided by law."); *State v. Herbel*, 296 Kan. 1101, 1109, 299 P.3d 292 (2013); *State v. Engelhardt*, 280 Kan. 113, 122, 119 P.3d 1148 (2005) ("K.S.A. [ ] 22-3405(1) is analytically and functionally identical to the requirements under the Confrontation Clause and the Due Process Clause."). Whether a defendant's right to be present was violated presents a question of law subject to our unlimited review. *Herbel*, 296 Kan. at 1106-07.

8

In determining whether a particular phase of a criminal proceeding qualifies as a critical stage, our Supreme Court has indicated that a court must examine "'whether the defendant's presence is essential to a fair and just determination of a substantial issue.' [Citation omitted.]" *State v. Carr*, 300 Kan. 1, 230, 331 P.3d 544 (2014), *rev'd on other grounds* 577 U.S. __, 136 S. Ct. 633, __ L. Ed. 2d ___ (2016). The United States Supreme Court has observed that a critical stage of trial entails "proceedings between an individual and agents of the State" with "'trial-like confrontations,' at which counsel would help the accused 'in coping with legal problems or . . . meeting his adversary.' [Citations omitted.]" *Rothgery v. Gillespie County*, 554 U.S. 191, 212 n.16, 128 S. Ct. 2578, 171 L. Ed. 2d 366 (2008) (quoting *United States v. Ash*, 413 U.S. 300, 312-13, 93 S. Ct. 2568, 37 L. Ed. 2d 619 [1973]). With particular relevance to this case, our Supreme Court has held: "A defendant does not have the right to be present at proceedings before the court involving matters of law. [Citation omitted.]" *State v. Edwards*, 264 Kan. 177, 197, 955 P.2d 1276 (1998). But see *State v. Turner*, No. 107,412, 2013 WL 4404176, at *2-3 (Kan. App. 2013) (unpublished opinion), *rev. denied* 299 Kan. ____ (2014).

Because we base our decision on a finding of harmless error, we will assume, without deciding, that Hubbard had a constitutional and statutory right to be present at the motion in limine hearing, and the district court violated that right by holding the hearing in her absence. See *Herbel*, 296 Kan. at 1110 (violations of a defendant's constitutional and statutory right to be present are subject to the harmless error rule).

To find an error harmless under K.S.A. 2014 Supp. 60-261, K.S.A. 60-2105, and the United States Constitution, a Kansas court must be able to declare the error "did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome." *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). When an error infringes upon a party's federal constitutional right, a court will declare the error harmless only where the party benefitting from the error persuades the court "beyond a reasonable doubt that the error complained of will not or did not affect

9

the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." *Ward*, 292 Kan. at 569 (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 3d 705, *reh. denied* 386 U.S. 987 [1967]).

In the present case, we agree with the State's contention that any error was harmless because Hubbard's "presence would not have contributed [to] or altered the district court's ruling on the . . . motion." Importantly, Hubbard's absence had little if any likelihood of changing the result of the trial. This is because an order resulting from a motion in limine is a temporary protective order. See *State v. Breedlove*, 295 Kan. 481, 494, 286 P.3d 1123 (2012). Without Hubbard's presence, the district court entered the pretrial ruling, yet this temporary order was subject to change at trial, when Hubbard was present in the courtroom. Moreover, as discussed in the next section, despite the district court's ruling limiting the admission of Hubbard's cross-examination, much of the information was ultimately presented to the jury.

In summary, assuming the district court violated Hubbard's right to be present when it held a hearing on the State's motion in limine without her being present, this error was harmless because there is more than sufficient evidence upon which to conclude, beyond a reasonable doubt, that the error did not affect the outcome of the trial in light of the entire record.

STATE'S MOTION IN LIMINE

For her second issue on appeal, Hubbard contends the district court committed reversible error when it granted the State's motion in limine.

Before addressing the merits of this argument, however, we note the State's contention that Hubbard did not properly preserve this issue for appellate review because

10

she failed to proffer evidence during trial on a motion to reconsider. See *State v. Holman*, 295 Kan. 116, 126-27, 284 P.3d 251 (2012) (A party must generally lodge a contemporaneous objection at trial to preserve any pretrial objection to the admission or exclusion of evidence.). But as Hubbard points out, in *State v. Evans*, 275 Kan. 95, 62 P.3d 220 (2003), our Supreme Court suggested that a party limited by a motion in limine need only make a sufficient evidentiary proffer outlining the substance of the challenged evidence to obtain appellate review.

Based on the pretrial hearing on the State's motion in limine, we have a sufficient record upon which to address the merits of Hubbard's complaint. As a result, we will overlook any procedural infirmity raised by the State and proceed to address the merits of Hubbard's argument.

Hubbard contends the district court violated her right to present a full and complete defense which adversely impacted her constitutional rights to a fair trial and due process. She claims the district court restricted the scope of her cross-examination of Beltch by excluding relevant impeachment evidence. In particular, she sought to admit testimony that Beltch "(1) had participated as a cooperating individual in another criminal case, and (2) had sought the advice of an attorney to reduce his federal prison sentence."

Multiple inquiries are involved when a party challenges the admission or exclusion of evidence on appeal:

> "First, the court addresses whether the evidence in question is relevant. [Citation omitted.] Relevant evidence is that which has 'any tendency in reason to prove any material fact.' K.S.A. 60-401(b).
> "Relevance has two elements: probative value and materiality. [Citation omitted.] Evidence is probative if it furnishes, establishes, or contributes toward proof. Probativity is reviewed for abuse of discretion. Evidence is material if it tends to establish a fact that is at issue and is significant under the substantive law of the case. Materiality is reviewed

11

de novo. [Citation omitted.] Second, the court reviews de novo what rules of evidence or other legal principles apply. Finally, the court applies the appropriate evidentiary rule or principle. Review of the district court's application of evidentiary rules depends on the rule applied. [Citation omitted.]" *State v. Coones*, 301 Kan. 64, 77-78, 339 P.3d 375 (2014).

Under the state and federal constitutions, criminal defendants are entitled to present their theory of defense. *Evans*, 275 Kan. at 102. Likewise, the Confrontation Clause of the Sixth Amendment guarantees the right to effective cross-examination of witnesses. *State v. Noah*, 284 Kan. 608, 616, 162 P.3d 799 (2007). "The defendant's fundamental right to a fair trial is violated if relevant, admissible, and noncumulative evidence which is an integral part of the theory of the defense is excluded. [Citation omitted.]" *State v. Patton*, 280 Kan. 146, 156, 120 P.3d 760 (2005), *disapproved on other grounds by State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006).

The right to present a defense, however, is not without limits. *State v. Alexander*, 268 Kan. 610, 616, 1 P.3d 875 (2000), *disapproved on other grounds by State v. Andrew*, 301 Kan. 36, 340 P.3d 476 (2014). Defendants may not "introduce irrelevant and immaterial evidence under the guise of 'presenting a defense'" and the right is "'subject to statutory rules and case law interpretation of rules of evidence and procedure.' [Citation omitted.]" *Alexander*, 268 Kan. at 616. District courts also retain discretion to impose reasonable limits on cross-examination ""based on concerns about . . . harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."" *Noah*, 284 Kan. at 616; accord *Holman*, 295 Kan. 116, Syl. ¶ 10 (the scope of cross-examination is subject to the district court's reasonable control).

We review a district court's decision to limit cross-examination for an abuse of discretion. *State v. Parks*, 294 Kan. 785, 797, 280 P.3d 766 (2012). A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable;

12

(2) is based on an error of law; or (3) is based on an error of fact. *State v. Mosher*, 299 Kan. 1, 3, 319 P.3d 1253 (2014).

Although, on appeal, Hubbard paints the district court's order in limine with a broad brush, the district court's ruling was actually quite limited. Regarding the *Berlon Muse* case, the district judge precluded Hubbard from questioning Beltch as to the specifics of other investigations with which he was involved, because this evidence was only marginally relevant given that Beltch did not receive additional consideration for his work. The district judge, however, allowed Hubbard to "inquire in depth" of Beltch regarding what consideration he received for his work on this case and his hope "that his cooperation will then result in an even greater reduction of his sentence in the future." This ruling appears to include the essence of the evidence Hubbard wished to introduce, as Frydman made the following proffer on this issue:

> "[T]he fact that Mr. Beltch is here working with the current DEU . . . on several cases I think is right for me to question him about. Or to question Officer Brown about the fact that . . . he used this CI in several investigations and has offered him . . . some sort of incentive for his assistance. I wouldn't go into it greatly."

Significantly, during his direct examination, Officer Brown informed the jury that Beltch participated in numerous investigations while he was working with the DEU: "In this case, [Beltch] did work other than this case for me. And as we made cases, I forwarded information to the U.S. Attorney and the probation office so they were kept kind of up to speed on what we were doing."

Likewise, regarding Beltch's attempt to acquire an attorney to assist him in obtaining a sentence modification, the district judge simply found that while Beltch's efforts to *find* an attorney were only marginally relevant and inadmissible, Hubbard could ask Beltch whether he intended to move for a sentence modification and whether he

13

*intended to hire* an attorney or had *retained* one. At trial, the following colloquy ensued between Frydman and the district judge:

> "THE COURT: I don't think—I don't have a problem with just saying, 'And so is it your intent to hire an attorney to file a motion after all this is over?' 'Yes.'
>
> "MR. FRYDMAN: But it's possible they have already retained an attorney to help—
>
> "THE COURT: You can ask him—
>
> "MR. FRYDMAN: Right. That's all I want—
>
> "THE COURT: —'Have you retained an attorney to do that? Yes or no.'
>
> "But as far as inquiring 'Have you called attorneys, have you attempted to hire an attorney,' that's just going way too far afield.
>
> "*You can say, 'Is it your intent to file a motion for modification of your sentence after all these are done, in hopes that you'll get a more lenient sentence?' 'Yes.'*
>
> "I think you can ask him, *'Have you hired an attorney to do that yet?'* And he can either say, *'Yes, I have hired one' or 'No, I haven't.'*
>
> "MR. FRYDMAN: Very well." (Emphasis added.)

At trial, Beltch acknowledged that while he had not obtained any promises from law enforcement, he hoped to "talk to the federal prosecutor about them further reducing [his] sentence because [he had] testified in [Hubbard's] case." And when the prosecutor asked Beltch if this was "just something that [he] plan[ned] to do" because he was hopeful he could obtain such a modification, Beltch replied, "I don't even have an attorney at this point."

Based on the slight limitation on cross-examination imposed by the district court, and the fact that the impeaching information was essentially admitted as evidence at trial, the jury had ample opportunity to consider evidence offered in Hubbard's defense. The direct and cross-examination at trial presented testimony which raised questions about Beltch's credibility. Accordingly, we find the district court did not abuse its discretion when it granted the State's motion in limine.

14

Hubbard also filed a motion in limine. She requested an order precluding, among other things, any reference to the fact that she operated a daycare out of her home at the time the offenses occurred. Hubbard claimed this evidence was irrelevant and more prejudicial than probative.

Prior to voir dire, the district court held a hearing to consider Hubbard's motion. At the hearing, Frydman emphasized that informing the jury that children may have been present when the drug transactions occurred would be unduly prejudicial. The prosecutor responded that she planned to ask questions regarding Hubbard's daycare facility during voir dire to determine whether any of the potential jurors knew Hubbard. As to the State's case-in-chief, the prosecutor explained that children were present during two of the drug buys, and their voices were recorded on Beltch's body wire. Thus, the prosecutor argued, "It's just part of how it went down."

The district court asked Frydman if he objected to voir dire questions to determine if any jurors knew Hubbard because their children went to her daycare center. Frydman confirmed that he had no objection. Frydman explained, however, that he did object to testimony regarding children being present in Hubbard's residence during the controlled buys.

The district judge partially granted Hubbard's motion:

"Well, I do think it's more prejudicial than relevant to discuss that there were children present or how many children. The daycare information, as far as the license, was seized to show who lived there. That was her name on the license, and that is relevant to place her there and it's her house and she has control over it. But I'm going to grant—partially grant the Motion in Limine as far as—I'm not going to ask you to redact the sound of

children in a tape, but no—Mr. [Beltch] needs to be instructed that he's not to talk about children or the number of children that are present during the sale."

When the prosecutor and Frydman pointed out that on one of the tapes, Beltch actually speaks to one of the children, the district judge stated, "Okay. I think the point is no extra emphasis on that."

At trial, the prosecutor moved to admit Hubbard's daycare license as Exhibit No. 30, but Frydman objected because "it show[ed] the daycare operation" and while the State argued that it was relevant to show home ownership, Exhibit No. 29, a copy of Hubbard's hunting license, served the same purpose. The district judge disagreed: "Doesn't show she owns the home, but I think it's [Exhibit No. 30] additional and better evidence actually than [Exhibit No. 29] that that is her residence where she resides and where she operates a daycare."

On appeal, Hubbard focuses her argument exclusively on the claimed erroneous admission of Exhibit 30, her daycare license. She argues it was more prejudicial than probative because the license "suggested to the jury that [she] endangered the lives of children by conducting drug transactions in their presence."

We disagree with Hubbard's contention. The license tended to prove that Hubbard operated an in-home daycare at that particular residence where the State alleged some of the crimes occurred. The drug transactions at Hubbard's residence were recorded by Beltch's body wire—which corroborated his incriminating testimony—while incidentally recording some children's voices. Given this factual context, the evidence of the daycare license was probative, although the district court properly limited Beltch's testimony regarding the children's presence during the drug transactions to prevent emphasizing that evidence. In sum, we find no error in the admission of the in-home daycare license.

16

Assuming that admission of the daycare license was in error, however, this ruling is subject to review for harmless error under K.S.A. 2014 Supp. 60-261. Here, any error that may have occurred was clearly harmless. First, without Hubbard's objection, the jury was advised during voir dire that she lived at the residence in Lawrence and also operated a daycare at that location. Second, the jury could infer that a daycare was operated from Hubbard's home because of the recordings that Beltch made during the drug transactions, some of which incidentally recorded children's voices. Finally, and most importantly, Hubbard testified extensively about her daycare operation; in fact, she went into such detail that the district judge determined she violated the order in limine and opened the door to evidence on this topic.

For all of these reasons, we find the district court did not err when it admitted the in-home daycare license in evidence at trial. Moreover, if this evidence was erroneously admitted, the error was harmless because there is no reasonable probability that the error affected the trial's outcome. See *State v. McCullough*, 293 Kan. 970, Syl. ¶¶ 8-9, 270 P.3d 1142 (2012).

PROSECUTORIAL MISCONDUCT

Hubbard contends the prosecutor committed misconduct during closing argument by improperly commenting on her credibility. In particular, Hubbard complains that the prosecutor characterized her testimony implicating Beltch as the cocaine dealer, rather than the purchaser, as a "cockamam[ie] theory." The State, on the other hand, argues that the prosecutor's remarks fall within the wide latitude afforded a prosecutor but, in the alternative, if the comments were somehow erroneous, the error was harmless.

17

The prosecutor's comments were made during her rebuttal argument:

"And one of the reasons that Mr. Frydman harped so much on this search of the car that they do before Jim Beltch goes is because he needs it to be a bad search to support this cockamam[ie] theory that Jim Beltch was actually selling to Tiffany Hubbard instead of making buys from her. That's why. That's why he's harping on it so much, because it has to support that theory."

Appellate review of an allegation of prosecutorial misconduct involving improper comments to the jury requires a two-step analysis. *State v. Roeder*, 300 Kan. 901, 932-33, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015). First, the appellate court determines whether the comments were outside the wide latitude afforded a prosecutor in discussing the evidence. 300 Kan. at 932-33. Second, if misconduct is found, the appellate court must decide whether the improper comments compel reversal; that is, whether the statements prejudiced the jury against the defendant and deprived him or her of a fair trial. 300 Kan. at 933.

Prosecutors are forbidden from offering the jury their personal opinion regarding the truthfulness of the defendant's testimony because such "'"expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony, not commentary on the evidence of the case."' [Citation omitted.]" *State v. Brown*, 300 Kan. 542, 560, 331 P.3d 781 (2014); see Kansas Rules of Professional Conduct 3.4 (2015 Kan. Ct. R. Annot. 609) ("A lawyer shall not: . . . [e] in trial, . . . state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused"). "The prohibition extends not only to using the word 'lie' but also to its 'derivative.' [Citations omitted.]" *Brown*, 300 Kan. at 560 (quoting *State v. Elnicki*, 279 Kan. 47, 62, 105 P.3d 1222 [2005] [prosecutor called defendant's testimony a "fabrication," "yarn," "final yarn," "the yarn spun here," and "four-part yarn"]; citing *State v. Akins*, 298 Kan. 592, 607, 315 P.3d 868 [2014] [prosecutor rhetorically asked did the jury "buy" defendant's story and said his testimony was "not credible"]).

18

Nevertheless, prosecutors have wide latitude to craft arguments that draw reasonable inferences from the evidence. *Brown*, 300 Kan. at 559-60; see *State v. Duong*, 292 Kan. 824, 831-32, 257 P.3d 309 (2011) (not improper commentary on credibility to identify specific evidence supporting wholly-evidence-based argument that victim's testimony was more believable than defendant's). Therefore, a prosecutor's comments must be considered in the context in which they were made, rather than in isolation. *Brown*, 300 Kan. at 560.

According to the American Heritage Dictionary 355 (5th ed. 2011), the word "cockamamie" is a slang term used to describe something that is "[t]rifling; nearly valueless" or "[l]udicrous; nonsensical." The State contends that no misconduct occurred here because referring to Hubbard's version of the events as a cockamamie theory is not equivalent to calling the defendant a liar. The State views the prosecutor's reference to the word cockamamie as "a rhetorical device" intended to point out the extensive evidence produced by the State that showed Hubbard was not a purchaser but a dealer in crack cocaine.

We find the prosecutor's description of Hubbard's defense as a "cockamam[ie] theory" does not qualify as a derivative method of calling Hubbard a liar. The State was merely commenting upon the implausibility of Hubbard's defense, rather than mounting a direct attack upon her credibility. The prosecutor properly referenced factors in evidence that the jury could consider in assessing Hubbard's credibility throughout the closing argument, and when read in context, the prosecutor did not use the word cockamamie in reference to Hubbard's veracity. Instead, the prosecutor was attempting to argue that the prosecution's version of events—that Beltch *purchased* rather than *sold* Hubbard drugs—was more believable, given the trial evidence, than the nonsensical account argued by Frydman.

19

Prosecutors may "craft an argument that includes reasonable inferences based on the evidence and [argue] that when a case turns on which of two conflicting stories is true, certain testimony is not believable." *State v. Davis*, 275 Kan. 107, 121, 61 P.3d 701 (2003); see also *State v. Baker*, 281 Kan. 997, 1014-15, 135 P.3d 1098 (2006) ("the prosecutor's comments regarding the feasibility of Baker's story[, *i.e.*, it "'defies physics, it defies logic, and it certainly defies common sense,'"] were within the wide latitude prosecutors are allowed in discussing the evidence"). Likewise, the "State has considerable latitude to comment on the weakness of the defense." *State v. Peterman*, No. 111,159, 2015 WL 8587505, at *9 (Kan. App. 2015) (unpublished opinion) (citing *State v. Williams*, 299 Kan. 911, 939, 329 P.3d 400 [2014]). We find no error in the prosecutor's remarks.

Nevertheless, assuming the prosecutor's remarks were improper, we next consider whether they were so prejudicial as to compel reversal. When determining whether prosecutorial misconduct requires reversal, appellate courts consider three factors, none of which is individually controlling: (1) whether the misconduct was gross and flagrant, (2) whether the misconduct showed ill will on the prosecutor's part, and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. *State v. Williams*, 299 Kan. 509, 540, 324 P.3d 1078 (2014). Before the third factor can ever override the first two, an appellate court must be able to say that the harmlessness tests of both K.S.A. 2014 Supp. 60-261 and *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824 , 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), have been met. *Williams*, 299 Kan. at 540-41. We will consider the three factors individually.

*Gross and Flagrant*

"In determining whether prosecutorial misconduct was gross and flagrant, among the things an appellate court considers are whether the comments were repeated,

20

emphasized improper points, were planned or calculated, or violated well-established or unequivocal rules." *Akins*, 298 Kan. 592, Syl. ¶ 7. In this case, the prosecutor's statements were not gross and flagrant because the prosecutor did not emphasize or unduly repeat her remarks, the record suggests that her rebuttal statements were spontaneous rather than calculated, and the prosecutor did not violate well-established or unequivocal rules.

*Ill Will*

A prosecutor's ill will is usually reflected through deliberate and repeated misconduct, mocking of a defendant, or indifference to a court's rulings. *State v. Bridges,* 297 Kan. 989, Syl. ¶ 19, 306 P.3d 244 (2013); *State v. Miller*, 284 Kan. 682, 719, 163 P.3d 267 (2007). We are persuaded that ill will did not motivate the prosecutor. There was no repeated misconduct or indifference to the district court rulings. While the prosecutor criticized the defense theory based on the substantial trial evidence proving Hubbard's guilt, the prosecutor did not personally disparage Hubbard.

*Overwhelming Nature of the Evidence*

Finally, we consider whether the evidence was of such a direct and overwhelming nature that any prosecutorial misconduct would likely have had little weight in the minds of jurors. The evidence proving Hubbard's guilt for the crimes of which she was convicted was substantial, if not compelling. Moreover, the district court properly instructed the jury on its duties as factfinder, including the obligation to weigh witness credibility, disregard statements made by counsel which are not supported by the evidence, and to consider with caution the testimony of an informant. In the absence of evidence to the contrary, we presume the jurors followed the instructions given to them. *State v. Mitchell*, 294 Kan. 469, 482, 275 P.3d 905 (2012). Lastly, the jury did not reach unanimous verdicts on several counts which suggests it considered the totality of the evidence, rather than the State's assessment that Hubbard's entire defense theory was

21

trifling or nonsensical. See *State v. Stafford*, 296 Kan. 25, 59-60, 290 P.3d 562 (2012). We find that the prosecutor's remarks did not prejudice Hubbard or deny her a fair trial.

In conclusion, the prosecutor's description of Hubbard's defense as a "cockamam[ie] theory" did not rise to the level of prosecutorial misconduct. Assuming the prosecutor's comments were improper, the misconduct is not reversible because there is enough evidence upon which to conclude, beyond a reasonable doubt, that the error had little, if any, likelihood of having changed the result of Hubbard's trial.

THE FORENSIC LABORATORY FEE

The district court ordered Hubbard, over her objection, to pay a $2,000 forensic laboratory fee. This amount was calculated based on a charge of $400 for each of five laboratory tests the Kansas Bureau of Investigation (KBI) performed in this case. While Hubbard acknowledges that K.S.A. 2013 Supp. 28-176 obligated the district court to assess a testing fee, she insists the district court should have only ordered her to pay for "laboratory services performed in connection with an investigation *that resulted in a conviction*." Consequently, Hubbard maintains she is only obligated to reimburse the KBI $1,200. Resolution of this issue involves the interpretation of statutory language, a question of law subject to de novo review. See *State v. Eddy*, 299 Kan. 29, 32, 321 P.3d 12, *cert. denied* 135 S. Ct. 91 (2014).

Pursuant to K.S.A. 2013 Supp. 28-176(a)(1), district courts are required to order "any person convicted . . . of a misdemeanor or felony . . . to pay a separate court cost of $400 for every individual offense if forensic science or laboratory services or forensic computer examination services are provided, in connection with the investigation by . . . [the KBI]." Relying upon *State v. Goeller*, 276 Kan. 578, 77 P.3d 1272 (2003), *overruled on other grounds by State v. Dickey*, 301 Kan. 1018, 350 P.3d 1054 (2015), Hubbard

22

contends the phrase "for every individual offense" limits the imposition of KBI fees to those offenses which result in convictions.

Goeller pled guilty to one count each of possession of methamphetamine and marijuana, and he entered a no contest plea to one count of driving under the influence. Under the authority of K.S.A. 28-176, the district court ordered Goeller to pay a $150 fee for each conviction, as the State pursued laboratory testing for each of the offenses. At the time, K.S.A. 28-176(a) provided: "'Any person convicted . . . shall pay a separate court cost of $150 as a [KBI] laboratory analysis fee for each offense if forensic science or laboratory services are rendered or administered by the [KBI] in connection with the case.'" 276 Kan. at 584.

Goeller argued that the legislature's use of the phrase "'the case'" in conjunction with its failure to explicitly explain whether the phrase "'each offense'" was intended to cover multiple counts demonstrated that similar to the docket fees outlined in K.S.A. 28-172a(c), the legislature intended to limit the assessment of lab fees to one fee per case.

Our Supreme Court, however, disagreed:

"K.S.A. 28-172a(c)'s wording demonstrates that the legislature was fully aware how to craft a statute to provide for only one fee per case. For whatever reason, it chose not to draft K.S.A. 28-176 in that manner. The phrase 'for each offense' is clear; '*each offense*' *means each count on which Goeller was convicted*. It matters not that multiple offenses were charged in one case." (Emphasis added.) 276 Kan. at 584.

The State insists *Goeller* is not applicable because in 2010, our legislature amended K.S.A. 28-176 by changing the phrase "each offense" to "every individual offense." See L. 2010, ch. 117, sec. 1. Although we presume the legislature intended to change the law as it existed prior to an amendment, the State offers no explanation as to how this amendment, which appears to represent a minor clarification, could be

23

considered a substantive change. See *State v. Snellings*, 294 Kan. 149, 157, 273 P.3d 739 (2012).

The State, however, also points to *State v. Gomez*, No. 104,265, 2011 WL 3658374, at *1-2 (Kan. App. 2011) (unpublished opinion), *rev. denied* 293 Kan. 1110 (2012), wherein a panel of our court concluded that the phrase "'in connection with the case,'" which has since been amended to read "in connection with the investigation," disproved Gomez' assertion that he could only be assessed KBI laboratory fees related to his crimes of conviction. See L. 2010, ch. 117, sec. 1.

In *Gomez*, a law enforcement officer stopped Gomez for possible intoxication, and during the investigation, the officer found a baggie containing what KBI laboratory testing confirmed was marijuana. The State charged Gomez with various crimes, including possession of marijuana, but when Gomez agreed to plead no contest to driving under the influence and aggravated battery, the State dismissed the other counts, including the marijuana charge.

At sentencing, the district court assessed a laboratory fee, and on appeal, Gomez argued that district courts may only impose a laboratory fee upon defendants that were both charged and convicted of a drug crime. After determining that *Goeller* did not advance Gomez' cause, the panel concluded:

> "Here, Gomez was charged with possession of marijuana. The drug testing was done in connection with the case. The fact that Gomez later negotiated a plea deal which involved dismissal of the drug charge in exchange for his plea to other charges does not change this fact.
> . . . .
> "Here, the legislature could have drafted K.S.A. 2008 Supp. 28-176 to only allow KBI testing fees for crimes of conviction, instead of testing fees 'in connection with the

case.' K.S.A. 2008 Supp. 28-176 is unambiguous. It clearly allows for KBI testing fees for tests completed 'in connection with the case.'" 2011 WL 3658374, at *1-2.

We find *Gomez* distinguishable because Gomez' convictions resulted from a plea agreement, whereas Hubbard's case went to trial and the jury was unable to unanimously agree on several counts, indicating insufficient evidence to convict on some charges. Additionally, *Gomez* is not binding precedent and we disagree with its interpretation of K.S.A. 2013 Supp. 28-176 for two reasons.

First, the *Gomez* panel overlooked the fact that in *Goeller*, the panel specifically referenced crimes *of conviction* when interpreting the phrase "'each offense.'" See *Goeller*, 276 Kan. at 584; *Gomez*, 2011 WL 3658374, at *1-2; *State v. Zugg*, No. 96,478, 2007 WL 1413133, at *1-2 (Kan. App. 2007) (unpublished opinion) (based upon *Goeller*, defendant argued he need only pay a laboratory fee for counts on which he was convicted and State conceded that the district court erred by assessing costs not related to the crime of conviction).

Second, reading K.S.A. 2013 Supp. 28-176(a)(1) as a whole indicates the legislature did not intend for the statute to be read in the manner *Gomez* suggests. K.S.A. 2013 Supp. 28-176(a)(1) states: "[A]*ny person convicted* . . . of a misdemeanor or felony . . . [shall] pay a separate court cost of $400 for *every individual offense* if . . . laboratory services . . . are provided, in *connection with the investigation* by [the KBI]." (Emphasis added.) As the *Goeller* panel found, this language clearly suggests that our legislature intended district courts to assess a laboratory fee for each crime of conviction in the case for which laboratory services were pursued in connection with the investigation of that offense. While the legislature did not explicitly limit the statute to crimes of conviction, it is difficult to read the statute in any other manner.

25

For the reasons given, we vacate the district court's assessment of a $2,000 lab fee. Given Hubbard's acknowledgement that she owes $1,200 in fees, a nunc pro tunc order shall be entered to reflect that reduced amount.

Affirmed in part and vacated in part.