NOT DESIGNATED FOR PUBLICATION

No. 113,608

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

DWIGHT JURGENS,
*Appellant.*

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed September 9, 2016. Affirmed.

*Carl F.A. Maughan* and *Sean M.A. Hatfield*, of Maughan Law Group LC, of Wichita, for appellant.

*Thomas R. Stanton*, deputy district attorney, *Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., LEBEN, J., and HEBERT, S.J.

LEBEN, J.: Dwight Jurgens, an employee of TNT Bonding in Reno County, was convicted of rape, aggravated human trafficking, and attempted aggravated human trafficking related to three women he had bonded out of jail. Each woman told a slightly different version of the same story at trial: Jurgens bonded her out of jail, took her to a motel or an apartment, and either expressly or implicitly threatened to take her back to jail if she refused his sexual advances. On appeal, Jurgens argues that the evidence at trial wasn't sufficient to support his convictions, that his constitutional right to a speedy trial

was violated, and that the district court should have instructed the jury not to make its decision based on sympathy.

Jurgens' sufficiency argument for the rape conviction is primarily that the jury shouldn't have believed the victim's testimony because she was a drug addict with a criminal history. But juries (or judges when sitting without a jury), not appellate courts, make the call on whether to believe a witness' testimony, and the victim's testimony was sufficient to support Jurgens' rape conviction—it was even corroborated by other evidence. Jurgens also argues that the evidence was insufficient to support his aggravated-human-trafficking convictions because it doesn't show, as the statute requires, that he coerced "employment" from the victims. But the victims testified to the sexual activities that Jurgens asked them to do, and Jurgens provides no convincing argument why sexual activities are not "employment" as that word is used in the aggravated-human-trafficking statute.

Next, Jurgens argues that the time period the State had to bring him to trial should have started when the State first filed a misdemeanor case against him in September 2012 rather than when the State filed this case against him in March 2013. But the charges in this case aren't the same as the charges in the previous case, so the time started running when this case was filed. The time between charging and trial in this case was a year and a half. Jurgens wasn't prejudiced by this delay, given the complexity of the case and the fact that about half of the delay was due to requests and motions made by the defense. Finally, Jurgens argues that the district court should have instructed the jury not to decide the case based on sympathy, but Kansas courts have repeatedly disapproved of the sympathy instruction in criminal cases except in highly unusual circumstances; we do not think a sympathy instruction was required here. Because we have considered each of Jurgens' claims on appeal but have found none that have merit, we affirm the district court's judgment.

2

Jurgens was a bonding agent for TNT Bonding in Reno County. Bonding companies help people charged with crimes get released from jail while waiting for trial. According to testimony from two different bonding agents (other than Jurgens), a person charged with a crime being held in jail generally agrees to pay 10% of the total bond (an amount of money set by the court) to the bonding company, sometimes secured by collateral or with a cosigner. In exchange, the bonding company gets that person out of jail and becomes responsible for making sure he or she shows up for court dates; the bonding company can be liable to pay the total bond to the court if the person doesn't show up for court. So as a bonding agent, Jurgens helped people get out of jail, was responsible for supervising them, and could send them back to jail if they violated the terms of the bonding agreement.

Around 2011, Detective Diana Skomal of the Reno County Sheriff's Office began investigating reports that Jurgens was abusing some of the women that he was bonding out of jail and identified four possible victims: N.W., T.S., R.W., and A.D. In September 2012, the State charged Jurgens with two misdemeanor counts of attempting to promote prostitution. On March 15, 2013, the State dismissed that case and filed this one, charging Jurgens with rape, aggravated criminal sodomy, and one count of aggravated human trafficking related to N.W.; one count of aggravated human trafficking related to T.S.; two counts of attempted aggravated human trafficking related to R.W.; and two counts of aggravated human trafficking related to A.D. All four women testified at trial, and because Jurgens challenges the sufficiency of the evidence, we must recount their testimony in some detail.

N.W. testified that she was a drug addict, that she had committed previous crimes of forgery and drug possession, and that she was currently on probation. She also said that she hadn't used drugs in a year and that she hadn't made any deals with the State in

exchange for her testimony. N.W. testified that Jurgens had bonded her out of jail at least three times. She said Jurgens had first bonded her out on October 1, 2011, had taken her to a convenience store for cigarettes and soda, and then had driven her to a park and threatened to take her back to jail if she didn't show him her breasts. N.W. said she had shown him her breasts and he had touched them. She testified that Jurgens had bonded her out a second time on February 1, 2012, and that he had gotten upset when she asked to be dropped off at a friend's house, saying that he "doesn't do this stuff for free" and that he wasn't "getting screwed over again." N.W. said that, on this occasion, Jurgens had taken her to the Sunflower Motel and had told her to undress; she had initially thought he was joking, but he had then said he could take her right back to jail. N.W. testified that after she had taken her clothes off, Jurgens removed his clothes. N.W. said that Jurgens had tried to have sex with her but hadn't been able to maintain an erection and instead had put his fingers in her vagina and anus without her consent.

N.W. testified that the third time Jurgens bonded her out of jail had been on May 13, 2012. This time, N.W. said, Jurgens had helped her buy some heroin before taking her to the Trails West Motel. The State introduced a Trails West receipt signed by Jurgens that was dated May 12, the day before he took N.W. to that hotel, and an employee of the Trails West Motel testified that this receipt was a true and accurate record of a room that was rented on May 13, so it appears that Jurgens rented the room the day before he got N.W. out of jail. (The registration card itself isn't included in the record on appeal.) N.W. said that Jurgens had shown her how to use heroin, which she hadn't done before, and that she had gotten high. She said that the heroin had made her "fade[] in and out" of consciousness and that when she woke up, her pants were off, her shirt was pushed up, and Jurgens was on top of her with his fingers in her vagina. She stated that she had been unable to fight back and that Jurgens had had sex with her. Jurgens then left her in the motel room and told her that if she left, his bounty hunter would find her.

4

Detective Skomal interviewed N.W. on October 17, 2012, and the video of that interview was played for the jury. N.W.'s trial testimony was consistent with her statements to Skomal.

Like N.W., T.S. testified that she was a drug addict and had committed past crimes, including forgery, theft, making a false information, and conspiracy to possess drugs. At the time of trial, she said she hadn't used drugs in 3 weeks and hadn't made any deals with the State in exchange for her testimony. T.S. testified that she had been in jail in September 2011 and that she had been desperate to get out; she had called Jurgens at least 15 times asking him to post bond. T.S. said that her daughter eventually arranged for Jurgens to bond her out, although T.S. hadn't known the details of what her daughter had promised Jurgens in exchange. Jurgens got T.S. out of jail on September 11, 2011, and drove her to her daughter's apartment. T.S. testified that when they got there, Jurgens had asked her if she understood what was going to happen; she told him that she did understand and that she wasn't doing anything against her will. At trial, T.S. stated that Jurgens hadn't forced her to have sex but that she had felt like she had no other option. T.S. testified that she had first performed oral sex on Jurgens, then they had had sex from behind, and then Jurgens had finished in her mouth. She said that she had spit Jurgens' semen onto a sweatshirt.

T.S.'s brother told the police about what had happened between T.S. and Jurgens. Detective Skomal interviewed T.S. in December 2011, and the video of that interview was played for the jury. The video is consistent with T.S.'s trial testimony. T.S. gave the sweatshirt that she spat on to the police, and they performed DNA testing on it. The forensic expert who tested the sweatshirt testified that it had T.S.'s blood on the sleeve and Jurgens' semen on the hood.

R.W. testified that she was a drug addict, had committed crimes of dishonesty, was currently in jail for a parole violation, and hadn't made any deals with the State in

5

exchange for her testimony. She said that Jurgens had bonded her out of jail on September 18, 2012, and had driven her to a convenience store for cigarettes and soda. R.W. said that Jurgens had then driven her to a motel and gotten a room, at which point R.W. had said that she wouldn't "do this" and that he could take her back to jail. She said that Jurgens had gotten upset because he'd already paid for the room, but he didn't take her back to jail; instead, he told her that they could discuss it later. The State introduced a receipt for the motel, signed by Jurgens, dated September 18, 2012.

R.W. testified that she had reported this event to the police the next day and had agreed to record her next conversation with Jurgens. That conversation took place on September 21, 2012, and the recording was played for the jury. On the recording, Jurgens suggested that if R.W. had sex with him, he would reduce the amount of money that she owed him. Jurgens told R.W. that she didn't have to have sex with him to stay out of jail and then asked her if she still wanted to do it, and she said yes. But R.W. testified at trial that, despite Jurgens' words, she felt like she had to agree to have sex to avoid being taken back to jail. Jurgens and R.W. did not actually have sex after this conversation.

A.D. testified at trial that she was a drug addict and had committed previous crimes, including forgery, identity theft, and drug possession. She stated that she hadn't made any deals with the State in exchange for her testimony and that she hadn't used drugs in 3 years. A.D. testified that Jurgens had bonded her out of jail on December 24, 2009. She said that Jurgens had sent her a lot of sexual text messages after bonding her out and had come to her apartment and asked her to show him her breasts (she refused). A.D. testified that Jurgens had indicated that he wanted to have sex with her, but she refused. She also said that he didn't explicitly threaten to send her back to jail if she didn't have sex with him but that the threat was implied. Jurgens revoked A.D.'s bond on February 19, 2010, but bonded her out again on March 2, 2010. The sexual text messages continued. A.D. testified that sometime in April, Jurgens had come to her house and had grabbed her crotch while he was there. Jurgens revoked A.D.'s bond again on April 28,

6

2010. A.D. testified that she believed Jurgens had revoked her bond both times because she had refused his sexual advances.

A.D. first contacted police about Jurgens in March 2012. Detective Skomal interviewed A.D. more fully on September 28, 2012, and the jury watched video of that interview, which is consistent with A.D.'s trial testimony.

The jury convicted Jurgens of rape and one count of aggravated human trafficking related to N.W., one count of aggravated human trafficking related to T.S., and two counts of attempted aggravated human trafficking related to R.W. It acquitted Jurgens of aggravated sodomy related to N.W. and two counts of aggravated human trafficking related to A.D. The district court denied several motions Jurgens made after the verdict, including a motion for acquittal on each charge, a motion for a new trial, and a motion for a downward-departure sentence (a less serious sentence than set out in our state's sentencing guidelines).

Jurgens had a criminal-history score of G, and the district court sentenced him to a total of 254 months in prison: 195 months for rape plus 59 months for one count of attempted aggravated human trafficking. Those sentences would run consecutively, or one after the other. The district court also imposed 155 months for each of the two counts of aggravated human trafficking and 59 months for the second count of attempted aggravated human trafficking, but these sentences were ordered to run concurrently with the others, meaning that they would simply run at the same time as the controlling 254-month sentence.

Jurgens has appealed to our court.

ANALYSIS

I. *The Evidence Was Sufficient to Support Jurgens' Convictions.*

Jurgens first argues that the evidence at trial wasn't sufficient to support his convictions. Unless a defendant waives the right to a jury trial, a jury is the factfinder in a felony criminal case, and an appeal challenging the sufficiency of evidence comes to us only after the State has won at trial. Since the factfinder has already found in the State's favor, we must consider the evidence in the light most favorable to the State. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014), *overruled on other grounds by State v. Dunn*, 304 Kan. ___, 375 P.3d 332 (2016). We then determine whether a reasonable factfinder could have found that the State proved beyond a reasonable doubt that Jurgens committed rape, aggravated human trafficking, and attempted aggravated human trafficking. 299 Kan. at 525. We do not reweigh the evidence or determine the credibility of witnesses. 299 Kan. at 525. The testimony of the victim alone can be sufficient to sustain a rape conviction, provided that the testimony isn't "so incredible or improbable as to defy belief." *State v. Race*, 293 Kan. 69, 79, 259 P.3d 707 (2011); see *State v. Borthwick*, 255 Kan. 899, Syl. ¶ 2, 880 P.2d 1261 (1994); *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

First, Jurgens challenges his rape conviction by suggesting that the testimony of the victim, N.W., wasn't sufficient to support the conviction. Jurgens' main argument is that N.W.'s testimony wasn't credible because she was a drug addict who had been convicted of various crimes of dishonesty. N.W. admitted that she was an addict, testified that she hadn't used drugs in over a year, and admitted to committing forgery and possessing drugs. The jury was entitled to find N.W. credible despite her past crimes and drug addiction. See *Williams*, 299 Kan. at 525.

N.W.'s testimony established that Jurgens had bonded her out of jail at least three times and each time had asked for escalating sexual favors, leading to the rape on the third instance. The first time, he drove her to a park, threatened to take her back to jail if she didn't show him her breasts, and touched her breasts. The second time, according to N.W., he took her to the Sunflower Motel, told her to undress, said he could take her right back to jail, tried but was unable to have sex with her, and put his fingers in her vagina and anus without her permission. The third time, after he took her to a convenience store, he helped her buy some heroin, showed her how to use it, and then had sex with her while she was high and unable communicate or resist. This third event took place on May 13, 2012, at the Trails West Motel, and the State introduced Jurgens' motel receipt dated May 12, along with testimony from a motel employee that the receipt showed Jurgens had rented the room on the 13th as well. We find nothing in N.W.'s account that would make this "the rare case in which the testimony [of a rape victim] is so incredible that no reasonable factfinder could find guilt beyond a reasonable doubt." *State v. Carter*, No. 109,966, 2014 WL 3907095, at *2 (Kan. App. 2014) (unpublished opinion), *rev. denied* 304 Kan. ___ (April 21, 2016). In addition to the corroboration of the motel receipt, we note that N.W. had reason not to report the offense when it occurred, since Jurgens was the person in charge of her freedom while charges against her were pending; N.W. told essentially the same story to law-enforcement officers when they first investigated; and R.W. told a very similar story about her interactions with Jurgens. None of those facts were present in the only case in which a court has found a rape victim's testimony insufficient to support a conviction without corroborating evidence. See *Matlock*, 233 Kan. at 4-6. This case is unlike *Matlock*, and the jury was free to accept—or reject— N.W.'s testimony. See *Race*, 293 Kan. at 79.

Jurgens also argues that it was logically inconsistent for the jury to acquit him of aggravated criminal sodomy and convict him of rape, but those two charges, although both related to N.W., are based on two different events that happened in two different places on two different dates: the sodomy charges allegedly occurred the second time

Jurgens bonded N.W. out of jail, while the rape occurred the third time. Furthermore, N.W.'s testimony about the rape was supported by the motel receipt, while there was no such physical evidence for the alleged sodomy at the Sunflower Motel in February 2012. We find no inconsistency in the verdicts that would cause us to question the validity of Jurgens' conviction for raping N.W.

Second, Jurgens argues, as he has throughout this case, that the evidence isn't and can't be sufficient to support his convictions for aggravated human trafficking (related to N.W. and T.S.) or his convictions for attempted aggravated human trafficking (related to R.W.), even when viewed in the light most favorable to the State, because the statutory definition of human trafficking doesn't apply to his behavior.

K.S.A. 2015 Supp. 21-5426(a)(3)(C) defines human trafficking as "knowingly coercing employment by obtaining . . . services that are performed or provided by another person through . . . abusing or threatening to abuse the law or legal process." The State charged Jurgens with the aggravated offense because his actions were "committed in whole or in part for the purpose of the sexual gratification of the defendant," which is the prerequisite for the aggravated offense. K.S.A. 2015 Supp. 21-5426(b)(2). In making the legal argument that he didn't commit human trafficking, Jurgens doesn't dispute that the evidence supports that he abused or threatened to abuse the law or legal process and that his actions were for his own sexual gratification, nor does he challenge the evidence supporting the overt-act element (taking some action in furtherance of the offense) of the attempt convictions—instead, he argues that there was no evidence that he coerced or attempted to coerce "employment" from N.W., T.S., or R.W.

The district court instructed the jury on the employment element as follows: "To establish this charge, each of the following claims must be proved: 1. Dwight Jurgens knowingly coerced *employment by obtaining services that were performed by* [*T.S., N.W., and R.W.*] through abusing or threatening to abuse the law or legal process. . . ."

10

(Emphasis added.) To employ means "to use or engage the services of." Merriam Webster's Collegiate Dictionary 408 (11th ed. 2014).

The State presented evidence that when a bonding agent helps a person get out of jail, the bonding agent becomes responsible for keeping track of that person and making sure he or she shows up for court dates. So when Jurgens bonded T.S., N.W., and R.W. out of jail, he became responsible for keeping track of their whereabouts; according to the evidence, he could enter their homes without a warrant and take them back to jail if they didn't comply with the terms of their bond agreement. Having sex with Jurgens wasn't part of the bonding agreements—but Jurgens may have treated it as though it were. T.S. testified that she believed Jurgens would have taken her back to jail if she hadn't consented to have sex with him. N.W. testified that Jurgens specifically told her that he would take her back to jail if she didn't show him her breasts. R.W. testified that Jurgens had taken her from jail to a motel and that she had told him she wouldn't have sex with him, even if it meant he would take her back to jail. Regarding their second (recorded) conversation, R.W. said she had thought "[h]e would take me back if I didn't say I wanted to have sex."

Again, Jurgens accepts that this evidence supports the conclusion that he either threatened to abuse or actually abused the legal process in his interactions with these women. But he suggests that the sexual acts he requested from T.S., N.W., and R.W. don't constitute "employment." Jurgens doesn't cite any authority for the proposition that sexual favors *aren't* employment. And what he asked these women to do fits into the common-sense definition of "employ": Jurgens got or attempted to get T.S., N.W., and R.W. to do a particular job for him—namely, to provide him sexual services. Nothing in the trafficking statute requires that the employment be for a *legal* job or service.

Moreover, the statute itself defines the behavior that it covers. It begins with "knowingly coercing employment" and then tells us exactly what that is: "obtaining . . .

11

services that are performed or provided by another person through . . . abusing or threatening to abuse the law or legal process." The evidence showed that Jurgens obtained sexual services by threatening abuse of the legal process—sending the women back to jail, even though they hadn't violated the terms of their release, if they did not submit to sexual acts. Under the statute, that's employment, and it's also coerced. Considering this to be "employment" also fits within the normal usage of that term—the dictionary definition we already cited: "to use or engage the services of." Merriam Webster's Collegiate Dictionary 408. Had Jurgens paid a prostitute for sex, we'd say that he employed the prostitute. Here, he coerced those he had bonded out of jail for sex. Under this statute, that's employment by coercion, and it's covered by the statute. The jury could reasonably conclude from the evidence that the sexual favors Jurgens received were "employment" that Jurgens coerced or attempted to coerce N.W., T.S., and R.W. to provide by threatening to take them back to jail (an abuse of the legal process).

In support of his argument that the aggravated-human-trafficking statute doesn't apply to him, Jurgens also notes that the Kansas Legislature recently amended the statute on unlawful sexual relations to specifically prohibit a bonding agent from having sex with anyone he or she bonds out of jail. K.S.A. 2015 Supp. 21-5512(a)(12) (effective July 1, 2014). He claims that this amendment means that the legislature didn't intend for the aggravated-human-trafficking statute to apply to his behavior, but that's not the case for two reasons.

First, just because Jurgens *could* be prosecuted under the amended statute if he were to repeat the behavior that led to this case doesn't mean that the State can't prosecute his previous actions under a different statute that also applies. Defendants are prosecuted based on the laws that exist at the time of the crime. See K.S.A. 2015 Supp. 21-5103(d) ("Prosecutions for prior crimes shall be governed, prosecuted and punished under the laws existing at the time such crimes were committed."); *State v. Denney*, 278 Kan. 643, 646, 101 P.3d 1257 (2004) ("Criminal statutes and penalties in effect at the time of a

12

criminal offense are controlling."). The State was free to prosecute Jurgens under the human-trafficking law for these offenses, which occurred in 2011 and 2012.

Second, the human-trafficking statute and this new statute do not cover the same things. The portion of the human-trafficking statute at issue in Jurgens' case outlaws *coerced* employment in certain situations, while the new statute he cites outlaws *consensual* sexual relations between various parties, including parole officers and parolees, corrections officers and those in custody, teachers and students, and now sureties (bondsmen) and those to whom they have provided a bail bond. Compare K.S.A. 2015 Supp. 21-5426(a)(3) with K.S.A. 2015 Supp. 21-5512(a). Presumably because of this very significant difference, the new offense of unlawful sexual relations by a surety or bondsman is a level-5 felony, a less serious charge than human trafficking (level 2) or aggravated human trafficking (level 1). See K.S.A. 2015 Supp. 21-5426(c); K.S.A. 2015 Supp. 21-5512(b)(2). The creation of this new offense does not signal that the human-trafficking statute fails to cover Jurgens' conduct.

II. *Jurgens Wasn't Denied His Constitutional Right to a Speedy Trial.*

Jurgens next argues that the district court violated his right to a speedy trial because the State filed a case against him in 2012, dismissed that case, and then filed this one, and all of that time together adds up to more time than the State is allowed to bring his case to trial. Jurgens' brief initially mentions both the statutory and constitutional right to a speedy trial, but his argument focuses entirely on the constitutional right. Accordingly, we consider only the constitutional claim and not the statutory claim that Jurgens has not pursued on appeal. See *State v. Boleyn*, 297 Kan. 610, 633, 303 P.3d 680 (2013) (issue not briefed is deemed waived and abandoned).

Jurgens didn't raise his constitutional speedy-trial claim before the district court, but we can consider it for the first time on appeal because it involves only a question of

law arising on proved or admitted facts and because it's necessary to prevent the denial of a fundamental right. See *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014). This presents a question of law that we must decide independently, without any required deference to the district court. *State v. Gill*, 48 Kan. App. 2d 102, 107, 283 P.3d 236 (2012), *rev. denied* 298 Kan. 1205 (2014).

The constitutional right to a speedy trial, guaranteed by both the Sixth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights, attaches—and thus begins to protect the defendant from undue delay—at formal charging or at arrest, whichever happens first. *State v. Rivera*, 277 Kan. 109, 112, 83 P.3d 169 (2004). The right to a speedy trial is meant "to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." *United States v. MacDonald*, 456 U.S. 1, 8, 102 S. Ct. 1497, 71 L. Ed. 2d 696 (1982).

In *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), the United States Supreme Court set out a four-factor balancing test to determine whether a defendant's constitutional right to a speedy trial has been violated. See *State v. Otero*, 210 Kan. 530, 532-33, 502 P.2d 763 (1972) (adopting the *Barker* test in Kansas). These factors are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530. No single factor is controlling—we must consider them together along with other circumstances that may be relevant. 407 U.S. at 533.

The first factor, the length of the delay, is a "triggering" factor—if the length of the delay isn't presumptively prejudicial, the court doesn't have to consider the other factors. 407 U.S. at 530. The Kansas Supreme Court hasn't set rigid rules for what constitutes a presumptively prejudicial delay; it depends on the facts of each case. See

*State v. Weaver*, 276 Kan. 504, 509, 78 P.3d 397 (2003). For example, the acceptable delay for a simple, straightforward crime will be shorter than the acceptable delay for a complex crime. 276 Kan. at 511.

Jurgens was charged in this case on March 15, 2013, and the jury trial took place September 9-16, 2014—a delay of one and a half years. But determining the full length of the delay requires us to decide whether, as Jurgens argues, we should include the time during which the previous case against Jurgens was pending before the State dismissed it. See *Gill*, 48 Kan. App. 2d at 109. First, Jurgens notes correctly that the State isn't permitted to dismiss and refile cases in bad faith to intentionally avoid a speedy-trial deadline. See *MacDonald*, 456 U.S. at 10 n.12. But Jurgens doesn't point to any evidence of such bad faith in this case.

Second, under Kansas law, the constitutional speedy-trial clock starts over when the State dismisses a previous case and refiles a new case against a defendant as long as (1) the State dismissed the previous case because of necessity or (2) the charge in the second case is not identical to the charge that was previously dismissed. *Gill*, 48 Kan. App. 2d at 113-14. Here, the previous misdemeanor case—two counts of promoting prostitution—was filed on September 25, 2012, and the State dismissed it on March 15, 2013, the same day that it filed charges in this case. If that time were to count, it would add about 6 months to Jurgens' speedy-trial clock; that would bring the total up to 2 years, which is more likely to be presumptively prejudicial. See *State v. Clemence*, 36 Kan. App. 2d 791, 799, 145 P.3d 931 (2006), *rev. denied* 283 Kan. 932 (2007) (finding that for various drug-possession charges, a 2-year delay was presumptively prejudicial). But none of the charges in this case—rape, aggravated criminal sodomy, aggravated human trafficking, and attempted aggravated human trafficking—are the same as the charges in the previous case. So the constitutional speedy-trial clock started over when this case was filed, and the 6 months that the misdemeanor case was pending against Jurgens don't count as part of the speedy-trial time in this case.

15

Given the complexity of the case against Jurgens—involving four victims, each of whom had her own criminal history, and nine counts of three different crimes—a delay of one and a half years is probably not presumptively prejudicial. Even so, we will consider the other *Barker* factors to determine whether Jurgens was denied his constitutional right to a speedy trial. See *Weaver*, 276 Kan. at 509-10 (looking at the other *Barker* factors is one way of considering all the circumstances of the case to determine whether the length of the delay is prejudicial); *State v. Fitch*, 249 Kan. 562, 564, 819 P.2d 1225 (1991) ("*Barker* mandates an ad hoc approach in which each case is analyzed according to its particular circumstances.").

Regarding the reason for the delay in this case, at least 9 of the 18 months that the trial was delayed resulted from Jurgens' own motions to continue the trial, leaving only 9 months caused by the State. Additionally, Jurgens filed several pretrial motions to dismiss, which extended the length of time before trial. See *State v. Smallwood*, 264 Kan. 69, 76, 955 P.2d 1209 (1998) (noting the defense's pretrial motions as part of the reason for delay). Regarding Jurgens' assertion of the right to a speedy trial, Jurgens did make statutory speedy-trial claims throughout this case, but this appeal is the first time he has raised his *constitutional* rights. Finally, Jurgens hasn't pointed to any prejudice that he suffered as a result of the delay. He simply claims, without detail or specificity, that his ability to defend himself was hampered by fading memories, unavailable witnesses, and not having access to the scenes of the crimes. But Jurgens must do more than simply say he was prejudiced—he must show that he was, and he hasn't done so here. Jurgens wasn't denied his constitutional right to a speedy trial.

Finally, we briefly address two minor issues related to the speedy-trial argument. First, we note that it is Jurgens' burden to designate a record that affirmatively shows prejudicial error. See *State v. McCullough*, 293 Kan. 970, 999, 270 P.3d 1142 (2012). Because Jurgens argues that the delay in a previous case should be counted toward the

16

delay in this case, the record on appeal should include the complete record from the 2012 misdemeanor case. See *State v. Young*, No. 107,056, 2013 WL 4778148, at *6 (Kan. App. 2013) (unpublished opinion). The transcript of Jurgens' sentencing hearing shows that Jurgens' trial counsel asked that the misdemeanor case file be added to the record for appeal purposes, and the district court granted that oral motion. But the misdemeanor case file isn't in the record on appeal, and it's not clear why. However, as we have explained, we still considered the impact of the misdemeanor case before we concluded that Jurgens' constitutional right to a speedy trial was not violated.

Second, the State argues that Jurgens' speedy-trial claim is moot. For some reason, Jurgens' trial counsel seems to have assumed that the two counts of attempting to promote prostitution in the previous case related only to A.D., so Jurgens' statutory speedy-trial motion to dismiss related specifically to those two charges. And the State, taking the factual basis of Jurgens' motion to dismiss at face value, argues on appeal that since the jury acquitted Jurgens of the charges against A.D., his speedy-trial claim here is moot. A thorough review of the record suggests, however, that the charges in the 2012 misdemeanor case most likely (but not definitely, since we don't have the misdemeanor case file in the record on appeal) related to R.W., not to A.D., so both Jurgens' original motion to dismiss and the State's argument on appeal appear to be based on incorrect facts. Furthermore, Jurgens has raised a different issue on appeal than he did at the district court: his motion to dismiss was based on his statutory speedy-trial right, but on appeal, he raises his constitutional speedy-trial right (which he is allowed to do for the first time on appeal, even though we ultimately ruled against him on the merits of that claim).

III. *The District Court Did Not Err When It Did Not Instruct the Jury to Consider the Case Without Sympathy or Favoritism.*

Jurgens argues that PIK Crim. 3d 51.07 should have been included in the jury instructions: "You must consider this case without favoritism or sympathy for or against either party. Neither sympathy nor prejudice should influence you." Jurgens acknowledges that he did not request this instruction at trial nor object that it was not given. As a result, we review the exclusion of this instruction for clear error. K.S.A. 2015 Supp. 22-3414(3); *State v. Brown*, 300 Kan. 542, 554-55, 331 P.3d 781 (2014). When reviewing for clear error, we first determine whether there was any error at all, asking whether the instruction was legally and factually appropriate. 300 Kan. at 554-55. If there was error, it is only reversible (or a "clear error") if this court is firmly convinced that the jury would have reached a different result if the error hadn't occurred. 300 Kan. at 555.

The sympathy instruction was deleted from the Kansas pattern instructions in 2000. PIK Crim. 3d 51.07 (2000 Supp.). And even before it was deleted, the Notes on Use for this instruction cautioned that it shouldn't be given except in "very unusual circumstances" because it tells the jury what *not* to do rather than what *to* do. PIK Crim. 3d 51.07 (1995 Supp.); see *State v. Maggard*, 26 Kan. App. 2d 888, 892, 995 P.2d 916 (error to give sympathy instruction in combination with refusal to give diminished-capacity instruction for mentally retarded defendant), *rev. denied* 269 Kan. 938 (2000). The jury *was* told, as is standard, that its "verdict must be founded entirely upon the evidence admitted and the law as given in [the court's] instructions." See PIK Crim. 4th 68.010. There was surely no suggestion in the court's instructions that sympathy should enter into the jury's deliberations.

So were the circumstances of this case so unusual that it was error for the district court not to give the sympathy instruction? No. The instruction was removed from the pattern instructions 16 years ago, and Kansas courts have long stated that the better

18

practice is to *not* give this instruction. *State v. Sully*, 219 Kan. 222, 226, 547 P.2d 344 (1976) (noting that it's a better practice to *not* give the sympathy instruction, even in a case with potentially prejudicial photographs). Jurgens attempts to analogize his case to *State v. Rhone*, 219 Kan. 542, 545, 548 P.2d 752 (1976), where the court found sufficiently unusual circumstances to justify the sympathy instruction: the jury went to a witness' home to hear her testimony because she was extremely sick with cancer. But nothing so unusual occurred in this case. See also *State v. Baker*, 281 Kan. 997, 1004-05, 135 P.3d 1098 (2006) (upholding refusal to give sympathy instruction despite paraplegic, possibly depressed victim); *State v. Holmes*, 278 Kan. 603, 634-36, 102 P.3d 406 (2004) (upholding refusal to give sympathy instruction despite victim's family members crying and being escorted from the courtroom); *State v. Reser*, 244 Kan. 306, 315-17, 767 P.2d 1277 (1989) (upholding refusal to give sympathy instruction despite 14-year-old victim and 39-year-old stepfather defendant in rape and sodomy case). The district court didn't err by not giving the sympathy instruction.

Finally, we should note that Jurgens also argues that the three trial errors he has alleged collectively rise to the level of cumulative error. Trial errors that are individually harmless may require reversing a defendant's conviction when considered together: "The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming." *State v. Hart*, 297 Kan. 494, 513-14, 301 P.3d 1279 (2013). The court has unlimited review of this issue and accumulates all the errors, analyzing whether the collective effect is so great that the errors cannot be harmless. *State v. Betancourt*, 299 Kan. 131, 146-47, 322 P.3d 353 (2014). Even so, a single error cannot constitute cumulative error, and the court will find no cumulative error when the record fails to support the errors the defendant raises on appeal. *State v. Williams*, 299 Kan. 509, 566, 324 P.3d 1078 (2014), *overruled on other grounds by State v. Dunn*, 304 Kan. ___, 375 P.3d 332 (2016); *Betancourt*, 299 Kan. at

147. Here, Jurgens alleged three errors, but we found none to have merit. Therefore, there can be no cumulative error. *Williams*, 299 Kan. at 566.

We affirm the district court's judgment.